AT

## DAVENPORT, APRIL TERM, A. D. 1885,

IN THE THIRTY-NINTH YEAR OF THE STATE.

PRESENT:

HON. JOSEPH M. BECK, CHIEF JUSTICE.
" AUSTIN ADAMS,
" WILLIAM H. SEEVERS, } JUDGES.
" JOSEPH R. REED,
" JAMES H. ROTHROCK,

---

## FORCHEIMER & CO. v. STEWART.

1. **Sale:** DELIVERY TO CARRIER: BILL OF LADING TO VENDOR: ASSIGN--MENT TO AND PAYMENT BY VENDEE WHILE GOODS ARE IN TRANSITU: WHEN TITLE PASSES: RISK OF DAMAGE. Where a vendor delivered goods to a carrier for transportation, and took a bill of lading to himself, which he endorsed in blank, and attached to a sight draft on the vendees, and then deposited the bill of lading with the draft in the bank, and got credit on his bank account for the amount of the draft, and, the draft and bill of lading being forwarded, the vendees paid the draft and. accepted the endorsed bill of lading while the goods were yet *in transitu*; *held* that the goods were not delivered, and that the title did not pass,. until the bill of lading had been delivered to the vendees; but that, after that time, in the absence of a contract to the contrary, the risk of damage to the goods by the elements was assumed by the vendees.

VOL. LXV—38

2. ———: OF GOODS BY AGENT TO BE DELIVERED: WARRANTY AS TO
QUALITY: FACTS CONSTITUTING.   Where defendant, in Council Bluffs,
Iowa, appointed a broker in Mobile, Alabama, to sell hams, and the
agent took plaintiffs' order for "choice, sugar-cured, canvassed hams,"
and plaintiffs had no opportunity to inspect the hams, but they were to
be shipped from Council Bluffs, and defendant shipped the same and
demanded and received payment therefor while they were in transit,
*held* that the facts amounted to a warranty that the hams shipped were
"choice, sugar-cured, canvassed hams."

*Appeal from Pottawattamie District Court.*

TUESDAY, APRIL 7.

ACTION to recover upon an alleged breach of warranty in a
contract of sale of a certain lot of hams.   There was a trial
to a jury, and verdict and judgment were rendered for the
defendant.   The plaintiffs appeal.

*Sims & Cadwell*, for appellants.

*Sapp & Pusey*, for appellee.

ADAMS, J.—The plaintiffs are provision dealers residing
and doing business in the city of Mobile, Alabama.   The
defendant is a pork-packer residing and doing business in
the city of Council Bluffs, Iowa.   In August, 1881, he
entered into a contract through his broker, one O. Wilson,
located at Mobile, for the sale of a large quantity of hams,
and shipped the same on the nineteenth day of that month.
The hams arrived in Mobile in due course of transporta-
tion, and in about ten days.   The plaintiffs had paid for them
on the twenty-fourth of that month, and while the same were
in transit.   They aver that they purchased the hams as
"choice, sugar-cured, canvassed hams," and that when the
same were delivered to them they were unsound, tainted and
unmerchantable.   They introduced evidence tending to show
that the hams, without their fault and without the fault of the
carrier, had, upon their arrival at Mobile, become sour, tainted
and skippery.   They also introduced expert evidence tending

to show that hams properly cured, and properly treated afterwards, will keep through the summer months, and that, too, though transported to a southern market like Mobile; and that if they are choice hams they will keep even longer than that.

The defendant, on the other hand, introduced evidence tending to show that the hams were properly cured, and were in good condition when shipped at Council Bluffs. As to when, if at all, the hams became unsound, there was no direct evidence whatever. As will be seen, it became important to determine with what warranty, if any, the hams were sold and delivered, and if with a warranty, whether the hams delivered were of the quality warranted at the time they were delivered; and in this inquiry it will be seen that there was involved another, and that is as to the time when the hams should be deemed to have been delivered. The plaintiffs contend that there was an express warranty that the hams were choice, sugar-cured, canvassed hams. The defendant denied that there was any express warranty. Again, the plaintiffs contend that the delivery to them took place when the hams were received by them from the carrier at Mobile. The defendant contends that the delivery to them took place when the hams were delivered to the carrier at Council Bluffs. Respecting this matter of delivery, the undisputed fact appears to be that the defendant took from the carrier a bill of lading, or shipping receipt, in his own name, whereby the hams were made deliverable to him or his order. This bill of lading the defendant indorsed in blank; to it he attached a sight draft, which he drew upon the plaintiffs, for the purchase price of the hams, and delivered the same to his banker in Council Bluffs in the usual way of such business, and received credit therefor in his bank account. The draft and bill of lading were forwarded by the bank to its correspondent in Mobile, and by the latter were presented to the plaintiffs, who, after some hesitation and negotiation, paid the draft and received the bill of lading.

I. Upon this state of facts the court instructed the jury in these words: "When the bill of lading was delivered to the plaintiffs, the property in the merchandise was vested in them, and the carrier who had it in possession for transportation was their agent, and the delivery of the goods was completed at that time, and the inquiry must be whether at that time the goods corresponded in quality with the warranty." The giving of this instruction is assigned as error. Where the shipper retains the right of disposing of the property while in the hands of the carrier, there is, of course, no delivery to the consignee. The object, usually, which the shipper has in taking the bill of lading in his own name, when he does so, is to enable him to retain such right. What the defendant's object was, there can be no doubt. He proceeded at once to transfer the bill of lading to the bank as security for the draft, the amount of which was credited to him in his bank account. There was, then, no delivery made to the plaintiffs by delivery to the carrier at Council Bluffs. The rule is very clearly expressed in *Merchants' Nat. Bank v. Bangs*, 102 Mass., 295. COLT, J., said: "If the bill of lading, or other written evidence of the delivery to the carrier, be taken in the name of the consignee, or be transferred to him by endorsement, the strongest proof is afforded of an intention to transfer an absolute title to the vendee. But the vendor may retain his hold upon the goods to secure the payment of the price, although he puts them in the course of transportation to the place of destination by delivery to the carrier. The appropriation which he then makes is said to be provisional or conditional. He may take the bill of lading or carrier's receipt in his own or some agent's name, to be transferred on payment of the price, by his own or his agent's indorsement, to the purchaser, and in all cases, when he manifests an intention to retain this *jus disponendi*, the property will not pass to the vendee." See, also, Benj. Sales, § 399, and cases cited.

Having reached the conclusion that the goods were not delivered by the defendant to the plaintiffs by delivery to the carrier at Council Bluffs, we come to inquire whether they were delivered by delivery to them, later, of the indorsed bill of lading. In our opinion they were. The defendant, from the time of such delivery, had no right or interest in the goods, and the *jus disponendi*, or right of disposing of the goods, had become absolute in the plaintiffs. The goods could not be sold nor incumbered by the defendant, nor properly taken upon attachment or execution by his creditors This being so, it would seem to follow that the risk of damage from the elements, in the absence of any agreement to the contrary, should be borne by the plaintiffs.

It is true that the plaintiffs could not be considered as having had an opportunity to inspect the goods at the time when the transfer was made to them of the bill of lading. But we do not see how the plaintiffs' inability to inspect at that time could give the transfer of the bill of lading an effect different from what it otherwise would have had. The plaintiffs were not bound to accept the transfer at that time. The defendant had put the goods in transit without a tender of delivery. The plaintiffs might unquestionably have withheld payment of the draft and acceptance of the bill of lading until the goods reached their destination. But for reasons satisfactory to themselves they preferred to pay in advance. It was their right to do so if they preferred, and secure whatever advantages there might be from such payment and such acceptance. But in securing those advantages we think they took upon themselves whatever risk there might be of damage from the elements from that time forward.

We ought to say, in this connection, that the plaintiffs claim that they declined at first to pay the draft and accept the bill of lading, and were induced to do so at the time they did only by an agreement on the part of the defendant that he would protect them, which agreement they construe as meaning that the defendant would guaranty that the goods

should be laid down in good condition at Mobile. Some evidence was introduced for the purpose of proving such agreement. But the plaintiffs' difficulty is that they do not declare upon such agreement. They barely allude to it, and they seem to treat it as a mere circumstance, to be taken with others, as tending to show that no delivery took place until the goods reached Mobile. But the agreement, if it had any effect, merely charged the defendant with the risk of damage from the elements during the remainder of the transportation. We think that the instruction given as to the time when delivery took place was correct, and that the plaintiffs could not be aided by the agreement referred to, without setting the same up as a cause of action.

II. We come now to consider whether there was evidence tending to show a special warranty of these hams. The court below instructed the jury, in effect, that there was not. The hams contracted to be sold were represented by the defendant's broker, Wilson, to be "choice, sugar-cured, canvassed hams."

2. ——: of goods by agent to be delivered: warranty as to quality: facts constituting.

Wilson claimed to be authorized by the defendant to contract for the sale of such hams, by a certain letter and certain telegram received by him from the defendant. A letter and a telegram were introduced in evidence. In the letter, under date of July 11th, being that in which the broker was employed by the defendant to sell hams, the defendant, in describing his hams, said: "I have no winter product except hams, sugar-cured, canvassed. They are very fine." In the telegram defendant said: "Hams strictly choice." The court instructed the jury in these words: "The original authority which the defendant gave the broker clearly appears to have been in writing, and is contained in the defendant's letter to the broker of July 11th, which is in evidence. While this letter contains language which is commendatory of the merchandise, it does not contain authority to the broker to sell it with a special warranty."

A representation as to the quality of goods by the use of

the word "choice" may or may not be a warranty, according to circumstances. The use of such word by the seller respecting goods which the buyer was inspecting, or might be presumed to inspect, would not ordinarily be a warranty. It would be a mere expression of opinion respecting the quality, of which the buyer should judge for himself. There would be no end to litigation if all words of commendation used by sellers were construed as warranties. But there are circumstances under which it is the right of both parties that representations respecting quality made by the seller should be regarded as statements of fact which may be relied upon by the buyer. This is so where the buyer is ignorant of the quality, and cannot be presumed by the seller to inform himself or acquire knowledge of it except through the representations of the seller. But the question before us does not, to our mind, involve precisely the principle above stated. At the time Wilson made the contract in question, the goods had not been designated. It was not a contract for specific goods of the quality of which the buyers could take notice. It was a mere executory contract for goods of a certain quality, and the seller was at liberty to fill it with any goods he saw fit, provided, only, they were of the kind and quality contracted for. The case differs in no essential respect from one where the buyer makes an order for goods of a certain kind and quality, and the seller accepts the order. The obligation of the seller is to execute the contract upon his part by a selection and delivery of the goods of the kind and quality contracted for. Such contract is not in the outset a sale with a warranty; it is executory. It becomes an executed sale upon delivery; and if the delivery is made under circumstances which preclude inspection, we think that a warranty arises that the goods are of the quality contracted for. If, in the case at bar, the plaintiffs contracted for "choice, sugar-cured, canvassed hams," the defendant was bound to select and deliver such. And when he drew a draft against them, and caused the draft to be presented, and he accepted payment

thereon at a time when the the goods were in transit, we think that a warranty arose that the goods thus shipped and drawn against while in transit were of the quality contracted for.

What the defendant's communications to his broker were concerning the quality of hams which he desired to offer through him in the Mobile market, we think that there was no doubt.   But we do not desire to rest our decision expressly upon these communications.   It is enough for us to know that the defendant constituted him his agent at Mobile to take orders for, and contract to sell, hams; and the order which the agent took from the plaintiffs was for choice sugar-cured, canvassed hams.   No one would claim that, where a principal should appoint an agent to contract for the sale of wheat, and such agent should contract for the sale of No. 1 wheat, the contract could be properly executed by the delivery of an inferior grade.   An agent appointed to contract for the sale of hams is clothed with apparent authority to contract for the sale of at least the usual grades known in the market, and especially for the sale of such a grade as that in question, where the hams are to be shipped, in summer, to a distant southern market.   It would be a reproach to the law to hold that a seller, under the circumstances shown, was not bound to fulfill his agent's contract as made.   Neither buyers nor sellers desire such rule established as that contended for.   It would go far towards destroying all confidence in an important mode of trade.   In our opinion, then, the instruction which the court gave, to the effect that there was no special warranty, cannot be sustained.   Nor do we think that the instruction given was without prejudice.   It is true that, under other instructions, the jury must have found that the hams were merchantable on the day the bill of lading was accepted by plaintiffs.   But the plaintiffs contracted for a superior grade, and the evidence tended strongly to show that, if the hams had been of such a grade, they would not have been unsound, tainted and skippery on the day they arrived.

REVERSED.