ALLISON L. HITCHCOCK v. THE GRIFFIN & SKELLEY COMPANY.

*Principal and agent—Merchandise broker—Sale—Ratification—Damages.*

1. A merchandise broker, who is not authorized to make binding contracts, as brokers usually do, but to take orders subject to approval, and is paid a commission on approved sales, is so far the agent of the vendor as to warrant the supposition on the part of the orderer that the order will be honestly transmitted, and that the goods will be shipped according to its conditions, and, by accepting the order, the orderee ratifies the contract as made by the broker.

2. Where the orderer of perishable fruit is required to accept a draft for the purchase price before the delivery or inspection of the fruit, and on such inspection notifies the agent who took the order of his rejection of the fruit, and the agent undertakes to telegraph to his principal, and some days later, no answer having been received from the principal, the orderer

writes him that he prefers not to have the fruit, and will not be satisfied with less than a specified reduction in price, and receives no answer from either the principal or the agent, the orderer is justified in selling the fruit for the principal's account, and charging him with the loss.

Error to Wayne. (Brevoort, J.) Submitted on briefs January 30, 1894. Decided March 27, 1894.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*George W. Bates,* for appellant.

*Bowen, Douglas & Whiting,* for plaintiff.

HOOKER, J. Kean & Co., the assignors of the plaintiff, being wholesale dealers in fruit, ordered, through one Blodgett, a car-load of oranges from the defendant, which was a similar dealer in California. The oranges arrived at Toledo, and Kean & Co. were required to accept a draft for the price before receiving or being allowed to inspect them, this acceptance being subsequently paid. The fruit proving unsatisfactory, this action was brought upon the contract for damages, and plaintiff recovered.

Two questions arise in the case:

1. The authority of Blodgett to bind defendant by his agreements, including ratification.
2. The measure of damages.

Blodgett resided in Toledo. It is claimed that he was not an employé of the defendant in the ordinary sense of the term, but was termed a "broker." His method of doing business was to obtain orders for oranges from local firms, and send them to defendant, which furnished him with quotations, subject to its acceptance. If accepted, he received a commission upon the sale from defendant.

The plaintiff introduced evidence tending to show that

the firm of Kean & Co. knew Blodgett, a merchandise broker in Toledo; that on March 13, 1891, they bought of Mr. Blodgett a car-load of seedling oranges, to be shipped by defendant, the same to be first class.     This fruit was received, and was satisfactory.     One of the firm testified further:

"The next transaction with Mr. Blodgett [*i. e.*, the one in controversy] was about April 6 or 7 following. He solicited our trade.

"*Q.* State fully the conversation you had with Mr. Blodgett at that time.

"*A.* Mr. Blodgett came into our store, as he usually does, three or four times a day, with a dispatch or quotation in his hands, and asked me if we did not want to buy a car of California oranges; and I told him, if he could sell us another car just like the previous car, we would take them.     He agreed to do so, and the order was given to him in that way.     *     *     *     That the oranges were to be Riverside seedling fruit, identically the same as the first car from the Griffin & Skelley Co.     I was very particular in giving the order.     I wanted the second car to be the same as the first,—what we would call fancy fruit."

On finding that the fruit was unsatisfactory, Kean & Co. saw Blodgett, and told him it was not the kind of an orange they had bought, and that it was not anything like the first car.     The witness further testified that they had on hand some of the oranges of the first car when the second car came in; that he compared them, and showed them to Blodgett; told him to notify Griffin & Skelley Co. that the car was not satisfactory.     "First, I told him we would sell the oranges for their account; but we had already paid the freight,—nearly $300.     A few days afterwards I asked him if he had heard from Griffin & Skelley Co.; and he said, 'No.'     As he did not hear from them, I wrote them a letter myself."     The following

99 MICH.—29.

is a copy of the letter, which was offered and read in evidence:

"TOLEDO, April 20, 1891.
"GRIFFIN & SKELLEY CO.,
          "Riverside, Cal.
" *Gentlemen:* The car of oranges billed us on the 8th just received. They do not compare with the first car we got from you, nor are they satisfactory in any way. A number of parties we sold them to have returned them to us. We have called your agent Mr. Blodgett's attention to it. We prefer not to have the oranges, and will not be satisfied with less than 50 cents a box reduction. You had better wire Mr. Blodgett at once.
          "Yours, E. M. KEAN & Co."

They had no reply from Mr. Blodgett as to what disposition to make of the oranges, or from the Griffin & Skelley Co. "Blodgett told me he had telegraphed to them. Then I sold them to the trade for the best price I could get. Soon after they arrived, I put my traveling man on the road to sell them, and it took about 30 days to close them out from the time of their arrival." The net amount received was $384.71.

The following letter, received by Kean & Co. from Blodgett, was introduced:

"RIVERSIDE, CAL., March 13, 1891.
"ALBRO BLODGETT,
          "Toledo, Ohio.
"*Dear Sir:* Your T. D. received this morning as follows: 'Sold Kean (E. M. Kean & Co.) duplicate of Toledo car; proclaim harmless; ship Toledo duplicate other car April 1. Will pay for first car before April 1. Answer.'"

On cross-examination witness said that, by the agreement with Blodgett, the oranges were to be delivered f. o. b. at Riverside, Cal. The following telegram from Blodgett was introduced:

"TOLEDO, OHIO, April 7, 10:33 A. M.
"GRIFFIN & SKELLEY CO.,
          "Riverside, California:
"April 7, 1891.   Kean 100 boxes, 200 size; 75 boxes,.
176 size; 50 boxes, 146 size; 25 boxes, 128 size; 50 boxes,
226 size; $2.   Follow assortment as nearly as possible."

This telegram was followed by letter:

"TOLEDO, April 8, 1891.
"GRIFFIN & SKELLEY CO.;
          "Riverside, California.
"*Gentlemen:*   I beg to confirm sale, and wired you
yesterday and today.   E. M. Kean & Co. one car, and
Toledo Fruit Co. one car, Riverside seedlings, at $2 f. o. b."

The foregoing, with some evidence taken under objec-
tion, tending to show the condition of the fruit when it
arrived in Toledo some 12 days after it was billed, con-
stituted the substance of the plaintiff's testimony.

The defendant introduced evidence in regard to the
relation of Blodgett to the corporation. It was, in sub-
stance, that the defendant employed no agents, but dealt
through a large number of brokers, who took and sent it
orders, subject to approval; that the trade so understood
it.   Blodgett received a commission upon approved sales.

The court instructed the jury that—

" If the jury find that Blodgett did not telegraph the
Griffin & Skelley Co. all the particulars of the arrange-
ment with Kean & Co., the contract made by him with
Kean & Co. was not binding on defendant, and your
verdict shall be for the defendant."

A review of the evidence convinces us that, in the law,
this alleged broker was no more or less than an agent of
the defendant. He was not authorized to make binding
contracts, as brokers usually do, but could take orders
subject to approval; in that respect following the common
custom of itinerant salesmen. He was paid a commission
by the defendant for approved sales. The purchasers had
a right to suppose that their offer would be honestly

transmitted, and that the goods were shipped according to its conditions, and, by accepting the order, the defendant ratified the contract as made by the agent. *Manufacturing Co. v. Aughey*, 144 Penn. St. 398. In this case it is said:

" The whole doctrine was well expressed by Sharswood, J., in the case of *Mundorff v. Wickersham*, 63 Penn. St. 87:

" ' If an agent obtains possession of the property of another by making a stipulation or condition which he was not authorized to make, the principal must either return the property, or, if he receives it, it must be subject to the condition upon which it was parted with by the former owner. This proposition is founded upon a principle which pervades the law in all its branches: "*Qui sentit commodum sentire debet et onus.*" The books are full of striking illustrations of it, and more especially in cases growing out of the relation of principal and agent. Thus, where a party adopts a contract which was entered into without his authority, he must adopt it altogether. He cannot ratify that part which is beneficial to himself, and reject the remainder; he must take the benefit to be derived from the transaction *cum onere.*'

" This doctrine is so reasonable and so entirely just and right in every aspect in which it may be considered, and it has been enforced by the courts with such frequency and in such a great variety of circumstances, that its legal soundness cannot for a moment be called in question. It is of no avail to raise or discuss the question of the means of proof of the agent's authority. The very essence of the rule is that the agent had no authority to make the representation, condition, or stipulation by means of which he obtained the property or right of action of which the principal seeks to avail himself. It is not because he had specific authority to bind his principal for the purpose in question that the principal is bound, but notwithstanding the fact that he had no such authority. It is the enjoyment of the fruits of the agent's action which charges the principal with responsibility for his act. It is useless, therefore, to inquire whether there is the same degree of technical proof of the authority of the agent in the matter under consideration as is required in ordinary cases, where an affirmative liability is set up against a principal by the act of one who assumes to be his agent. There the question is as to the power of the assumed agent to

impose a legal liability upon another person; and, in all that class of cases, it is entirely proper to hold that the mere declarations of the agent are not sufficient. But in this class of cases the question is entirely different. Here the basis of liability for the act or declaration of the agent is the fact that the principal has accepted the benefits of the agent's act or declaration. Where that basis is made to appear by testimony, the legal consequence is established."

It is the everyday practice to apply this rule to accepted orders for merchandise, on the familiar principle that a principal is bound by the representations of his agent when acting within the scope of his authority which his principal has permitted him to appear to possess. Mechem, Ag. §§ 279–281, and cases cited. Even if Blodgett were a broker in the strictest sense, it is not clear that he could not bind his principal by a sale by sample and with warranty, especially if it was according to the usual and customary mode of sale. *Forcheimer v. Stewart*, 65 Iowa, 600; *Heyn v. O'Hagen*, 60 Mich. 150; *Andrews v. Kneeland*, 6 Cow. 354; Story, Ag. §§ 59, 60, 109; *Boorman v. Jenkins*, 12 Wend. 566; *Waring v. Mason*, 18 Id. 425; *Upton v. Suffolk Co. Mills*, 11 Cush. 586; *The Monte Allegre*, 9 Wheat. 644; *Helyear v. Hawke*, 5 Esp. 72; *Gibson v. Colt*, 7 Johns. 390; 1 Pars. Cont. 60; Whart. Ag. § 710. *Contra, Dood v. Farlow*, 11 Allen, 426. And see *Brady v. Todd*, 9 C. B. (N. S.) 592; *Smith v. Tracy*, 36 N. Y. 79. But this is not a case arising upon an attempt to hold the vendor to a contract made by a broker. The defendant has accepted the order, and received its pay, and now seeks to vary the terms of the order by calling the agent a broker, and questioning his authority. We think the trial court committed no error in leaving these questions to the jury.

It is further contended that the sale by Kean & Co., without notice, was an acceptance of the fruit in fulfillment of the contract. The evidence showed a notice to the agent and a letter to defendant, both of which were

disregarded. Kean & Co. had paid $300 freight, and had obligated themselves to pay for the goods by reason of the acceptance before an opportunity was given them to see the oranges. The court instructed the jury that if defendant never received any notice of a rejection by Kean & Co., or that Kean & Co. would sell the same for its benefit, Kean & Co. had no right to charge defendant with any loss incurred in the sale of the oranges. Blodgett had been notified, and said he would wire defendant, and the evidence shows that defendant was not disposed to take any notice of Kean & Co.'s complaint. Under such circumstances, they could do no less than sell the fruit. It was perishable fruit, and to have done less could not be justified.

Judgment affirmed.

The other Justices concurred.