STONE v. WALKER et al.   (6 Div. 442.)

(Supreme Court of Alabama.   May 10, 1917.
On Application for Rehearing,
Dec. 20, 1917.)

1. CONTRACTS ☞94(5)—FALSE STATEMENT — RESCISSION—"FRAUD."

A material false statement, relied upon by a party in ignorance of its falsity, and which materially influenced him to enter into a contract, constitutes a "fraud" authorizing rescission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraud.]

2. CONTRACTS ☞266(2)—FRAUD—RESCISSION —RESTORATION OF PROPERTY RECEIVED.

As a condition precedent to the exercise of the right to rescind a contract brought about by false representations and fraud, the party complaining, if practicable, must restore or offer to restore what he has received by virtue of the contract, a ruling without application where it has become impossible to make restoration by reason of the conduct or default of the other party.

---

3. CONTRACTS ☞259—FRAUD—RESCISSION—INSOLVENCY.

The right to rescind a contract for fraud does not depend upon the insolvency of the other party, nor upon the inadequacy of an action at law for damages.

4. CANCELLATION OF INSTRUMENTS ☞32—SUIT TO RESCIND CONTRACT—EQUITY JURISDICTION.

Courts of equity do not take jurisdiction of a suit for rescission of a contract merely to declare such rescission, but only to administer some form of equitable relief or protection not available in other forums, or where, on account of the insolvency of the offending party, a judgment at law might fail to compensate the injured party or to place him in statu quo.

5. CORPORATIONS ☞448(2)—QUASI RATIFICATION OF ACT OF PROMOTERS.

A corporation, to be bound by the acts of its promoters, must do some act making their contract binding on it; strictly speaking, it cannot ratify the contract, because ratification implies at least the existence of a person or thing in whose behalf the contract might have been made when it was made.

6. BANKS AND BANKING ☞39—STOCK—SUBSCRIPTION CONTRACT—PROMOTERS.

Where a bank availed itself of a subscription to its stock made before it was formed, and received the price paid, and issued the stock to the subscriber, thereafter treating him as a shareholder, the subscriber and also the bank were bound by the subscription contract as if the bank had made the original contract of subscription when in existence by legally authorized agents.

7. BANKS AND BANKING ☞39—PROMOTERS' CONTRACT — SUBSCRIPTION INDUCED BY FRAUD—RESCISSION.

Where the promoters of a bank induced plaintiff to subscribe to its stock, prior to organization, by false representations, and the bank issued the stock to plaintiff, and recognized him as a shareholder, thus adopting the subscription contract, it adopted the burdens as well as the benefits of the contract, and was liable to suit for rescission for fraud.

8. BANKS AND BANKING ☞39 — MISREPRESENTATIONS—RESCISSION OF CONTRACT.

Where the promoters of a bank formed to take over the business of an insolvent bank, to induce a stockholder in such insolvent bank to take stock in the new bank, misrepresented the assets which would be acquired from the old bank, the liabilities assumed, and the incumbrances upon the property acquired, the fraudulent representations were such as to authorize the rescission of the subscription contract.

9. BANKS AND BANKING ☞39 — SUBSCRIPTION TO STOCK—FRAUD—RESCISSION.

Where the promoters of a bank were guilty of misrepresentations in inducing plaintiff to subscribe to the bank's stock before organization, plaintiff, not guilty of laches, guilty of no negligence in discovering the fraud, and who had not ratified the contract of subscription or waived the fraud, could maintain his bill for rescission of the subscription contract against the bank and the state bank superintendent in whose hands its affairs were for liquidation.

10. CORPORATIONS ☞80(12) — SUBSCRIPTION TO STOCK—FRAUD—RESCISSION.

A bill for rescission of a stock subscription contract against a corporation in the hands of a receiver or assignee must show that complainant acted promptly after discovery of the fraud complained of, was not guilty of laches or negligence, and did not ratify the contract or waive the fraud, or receive benefits as a stockholder.

11. BANKS AND BANKING ☞39—RESCISSION OF SUBSCRIPTION TO STOCK—AVERMENT OF BILL.

An averment of the bill of a stockholder in a bank against the bank and the state bank superintendent for rescission of the stockholder's subscription to the stock of the bank that the bank was in failing condition and was being liquidated by the state superintendent was necessary only to give the bill equity as against the officer, not as against the bank.

12. BANKS AND BANKING ☞63½—LIQUIDATION BY STATE BANK SUPERINTENDENT—INSOLVENCY.

A bank need not be insolvent before it can be taken over by the state bank superintendent for liquidation.

13. BANKS AND BANKING ☞39—RESCISSION OF SUBSCRIPTION TO STOCK — NEGATIVING RIGHTS OF CREDITORS.

In suit by a bank stockholder against the bank and the state bank superintendent to rescind his subscription for fraud of the bank's promoters, it is not necessary that the bill should negative prior rights of creditors; such matter being peculiarly within the knowledge of the bank and the superintendent.

14. BANKS AND BANKING ☞39—RESCISSION OF SUBSCRIPTION TO STOCK — STATUS OF STOCKHOLDER AS CREDITOR.

If a subscription to bank stock is rescinded for fraud of the bank's promoters at the suit of the stockholder, he becomes one of the bank's creditors, but his rights may or may not be secondary to those of all other creditors.

15. BANKS AND BANKING ☞39—RESCISSION OF SUBSCRIPTION TO STOCK — DENIAL OF REMEDY FOR LACK OF FUNDS.

The mere fact that a bank, whose stockholder is seeking rescission of his subscription contract for fraud of the bank's promoters, has no funds to repay all or a part of the money paid by the stockholder, should not prevent granting relief.

Appeal from City Court of Birmingham; H. A. Sharpe, Judge.

Bill by Kinzea Stone against A. E. Walker, as Superintendent of Banks, and another, to rescind contract of subscription to bank stock. From a decree for respondents, complainant appeals. Reversed, rendered, and remanded.

Application for rehearing overruled; Anderson, C. J., and McClellan, J., dissenting.

The letter referred to is as follows:

"W. N. Malone, City—Dear Sir: I think it would be a good idea to get a short statement signed by Mr. Jackson and Mr. Hutton, too, if here, as trustees for the incorporators showing the following facts so that we can exhibit it to Col. Stone: (1) Approximately the amount of cash that will be received by the new bank from the state superintendent of banks; (2) show whether or not the third mortgage bond on the building has been placed so as to enable the building company to pay off its indebtedness to the old bank, and the total amount of cash that will be received by the new bank from this source; (3) the total amount of cash assets on hand when the bank opens for business; (4) the total amount of liabilities of the old bank assumed by the new bank; (5) the appraised value of the real estate, less incumbrances of the old bank, to be acquired by the new bank; (6) the face value of all other assets of the old bank, and the probable amount of same that can be collected; (7) in the last above item please keep the interest in the building company separate

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

from other assets. Yours very truly, James A. Mitchell."

In reply to this letter is the following:

"In reply to your favor of recent date, addressed to W. N. Malone, beg to say that we had a committee of prominent bankers pass upon the commercial loan of the Jefferson County Savings Bank, and this committee of bankers suggested a real estate committee to pass upon the real estate and real estate loans. From the reports and other information which we have received, the following are the facts as we see them: [Here follows the first, second, and third representations as set out by Judge Mayfield in his statement of fact;] (4) the total liabilities of the old bank to be assumed by the new bank is approximately $1,287,000, which is composed of savings and checking accounts; (5) the appraised value of the real estate including old bank building is $179,000, which is carried on the books of the old bank at $140,000; (6) the face value of all the assets of the old bank acquired by the new bank is about $1,800,000, and we feel that there can be collected a salvage of from $300,000 to $400,000. Trusting this information is what you want, I am yours very truly. A. E. Jackson:"

Appellant, as a stockholder in the appellee bank, filed this his bill against the bank, and the state superintendent of banks who had taken over the bank to the end of its liquidation under the statute of this state. The purpose of the bill is to rescind the contract of subscription by which complainant purchased his stock, and have refunded to him the amount paid therefor, viz. $10,000.

The alleged ground for rescission is that fraudulent representations were made to complainant by the promoters and incorporators of the bank, touching the financial condition of the bank when organized, its assets and liabilities. These representations were in writing, in the form of a letter written by one of the promoters of the corporation, who, it is alleged, had been agreed on as the president to be elected of the corporation, and who was shortly thereafter elected to the place, and was acting as such official.

It is also alleged that it was agreed among the several promoters and incorporators that the letter in question should be written, and that it was so written, in response to a letter written by appellant's attorney, requesting that the incorporators give a signed statement as to the financial condition and status of the proposed banking corporation, in the way of assets, liabilities, incumbrances, etc. The representations alleged to be false were as follows:

"(1) There will be approximately $250,000 in cash to be turned over by the state superintendent of banks.

"(2) The issue of $400,000 of 6 per cent. third mortgage bonds have been placed on a par basis, which will be, in fact, more than sufficient to pay all the indebtedness of the old bank and the floating indebtedness of the building company, should we find that we need the money.

"(3) Approximately $1,150,000 in cash will be on hand when the new bank opens August 2, 1915."

It is also alleged that the representations were made with the intent to deceive appellant, that he relied upon them and acted upon them, and that they did deceive him. It is also alleged in the bill that before the letter was written, containing the false statements, it had been agreed among the incorporators of the bank that they would send one of their number, viz. one Malone, together with appellant's attorney, who resided in Birmingham, to the home of appellant, in Georgetown, Ky., to induce appellant to subscribe for stock in the new corporation to be formed.

The letter was written (which the reporter will set out), and was written for the purpose of obtaining data to present to appellant, for his information in determining whether or not he would take stock in the proposed corporation. The information was presented to him, as was intended to be done, and he acted on it.

It is also alleged that appellant was a nonresident of the state at the time he was induced to subscribe for the stock, and did subscribe and pay his money therefor; that he was at his home in Georgetown, Ky, ill and confined to his room.

It is alleged that appellant subscribed for his stock on or about the 25th day of July, 1915, and that the bank was organized on the 29th day of July, 1915, commencing the banking business on or about the 2d day of August, 1915, and continued to do business in Birmingham, Ala. until the 28th day of January, 1916, when it was taken over by the state bank superintendent for the purpose of its liquidation in accordance with the state laws.

It is also alleged that appellant did not know of the falsity of the statements made to him, and upon which he relied and acted, until the 21st day of February, 1916, after the bank had been taken over by the state superintendent of banks; that on account of his nonresidence and absence from the state, and of his ill health, he had had no opportunity to learn the true financial condition of the bank, or of the falsity of the statements until after the bank was so taken over.

The bill also alleges that the appellee bank was organized, with the knowledge and consent of the state superintendent of banks, for the purpose of taking over the assets and assuming the liabilities of the Jefferson County Savings Bank, which was then in process of liquidation under the control of the state bank superintendent; that it was therefore the object, in forming this new bank, that it acquire all the assets and business of the old corporation, and carry on its business in the building formerly occupied, and owned and controlled, by the old corporation; and that this purpose or intention was carried out, the new corporation continuing the business of the old, until it was in turn taken over by the state bank superintendent for the purposes of liquidation. The letters (which will be set out by the reporter) will show that the statements related largely to assets acquired

from the bank absorbed, and to its liabilities assumed. It is also alleged that appellant was a stockholder in the old bank afterwards absorbed by the new one.

It therefore appears that the object and purpose of the letters in question was to inform appellant as to the assets which would be acquired from the old bank absorbed, as to the liabilities assumed in consequence thereof, and as to the incumbrances upon the property acquired by the absorption of the old bank.

It is therefore made to clearly appear that appellant had a right to rely upon these representations, and that he did rely upon them; and if they were false and resulted to his damage, he ought to have a remedy of some kind, against some person or firm.

James A. Mitchell, of Birmingham, for appellant. Coleman & Coleman, of Birmingham, for appellees.

MAYFIELD, J. If this were a suit between man and man, or between two individuals, under the facts averred, all would concede that the bill contains equity, and that it was not subject to the demurrer interposed. The following principles are well settled by the authorities, or are patently correct.

[1] A material false statement, relied upon by the other party in ignorance of its falsity, and which materially influences him to enter into the contract, constitutes a fraud which will authorize a rescission. Sledge v. Scott, 56 Ala. 202; Perry v. Johnston, 59 Ala. 648; Davis v. Betz, 66 Ala. 206; Rice v. Gilbreath, 119 Ala. 424, 24 South. 421; Brewer v. Arantz, 124 Ala. 127, 26 South. 922; Moore v. Barber Asphalt Pav. Co., 118 Ala. 563, 23 South. 798; 7 Mayf. 182.

[2] As a condition precedent to the exercise of the right of rescission, the party complaining must, if practicable, restore, or offer to restore, to the other party what he had received from him by virtue of the contract. Cozzins v. Whitaker, 3 Stew. & P. 322; Jemison v. Woodruff, 34 Ala. 143; Young v. Arntze, 86 Ala. 116, 5 South. 253; Rice v. Gilbreath, 119 Ala. 424, 24 South. 421. This obviously has no application, however, where it has become impossible for such party to make such restoration by reason of the conduct or default of such other party. Johnson v. Oehmig, 95 Ala. 189, 10 South. 430, 36 Am. St. Rep. 204.

[3] The right to a rescission on account of fraud does not depend upon the insolvency of the other party, nor upon the inadequacy of an action at law for damages. Baker v. Maxwell, 99 Ala. 558, 14 South. 468.

[4] Courts of equity do not take jurisdiction merely for the purpose of declaring a rescission, but only for the purpose of administering some form of equitable relief or protection not available in other forums, or where, by reason of the insolvency of the offending party, a judgment at law might fail to compensate the injured party, or to place him in statu quo. Merritt v. Ehrman, 116 Ala. 278, 22 South. 514; Hafer v. Cole, 176 Ala. 248, 57 South. 757; 7 Mayf. Dig. 182.

The bill in this case as last amended clearly and explicitly brings the case within the above rules of law.

Is the result different, or are the rules of law different, where one of the parties, the defendant, is a corporation, which has received the benefit of the contract induced by fraud and sought to be rescinded, but which ceased to be a going concern before rescission sought, with its property lodged in the hands of a receiver or of a representative in law, to the end of the administration or liquidation of its affairs, as is shown to be the case at bar? Or is the effect and result different when the false representations were not made by the officers of the corporation, or, if made by the officers, were made at a time when they were not in fact or in law such, though they became such soon after, and when the representations were made about, and for and on behalf of, the corporation, and not of the persons making them, and when the corporation received the benefit or result of the representations? These questions are not so easy of answer. And if the answer is that they make different cases, wherein are they different, and what are the rules applicable to each?

We have not been referred to any decision of this court in a case in all respects similar to this; hence we must look to the textbooks and to the adjudicated cases of other courts, or for authority in like cases. We have decisions of this court in cases somewhat similar; that is, in which actions at law, or defenses to actions, on subscriptions for stock in corporations, rested on the ground of the right of the stockholder to rescind, and recover back what he has paid, or to avoid liability as for the consideration not paid, because of the fraud of the corporation or of its agents in procuring the subscription. It was once held that an action for fraud or deceit would not lie against a corporation, because the gist of the action was fraudulent intent, and intent was not imputable to an artificial body; but in more recent times it is almost universally held that such actions will lie against corporations.

There are at present many courts, and extant many decisions, holding that a corporation cannot have an agent before it has an existence, just as a deceased person, or an unborn child, or even an infant, cannot have or appoint an agent; and for this reason it is said that corporations are not liable for the fraud of their promoters (as in the making of false representations or the circulating of deceptive prospectuses, or otherwise) committed before the corporation comes into existence. This is on the theory that, as neither the corporation itself nor its agents committed the

fraud, the corporation is not responsible therefor.

[5] There are, however, other decisions and authorities holding that, while the corporation could not act itself, nor have an agent, before it had existence, yet if the contract of subscription to the capital stock of the corporation to be formed was induced by the fraud of the promoters, the subscriber, in certain cases, might have relief against the corporation: (1) If he has paid his money to the corporation for his shares under conditions which will authorize an action for deceit, he may surrender or tender his stock to the corporation, in an action for money had and received; (2) if he be sued by the corporation on his subscription contract, he may set up the fraud of the promoters in procuring his subscription as a defense; (3) he may go into equity and rescind the contract, and have the money paid by him on the fraudulent contract refunded. This last remedy, says Mr. Cook, is the fairest, safest, and most convenient remedy for all parties. It is notice to all parties interested in the matter, not to further rely upon the contract of subscription, and avoids the risk of the future insolvency of the corporation, which might defeat all relief by the stockholder against the corporation. Cook on Stockholders, § 155. In order, however, for the corporation to be bound by the acts of its promoters, it must, after it comes into existence, do some act which makes the contract binding on it; it is sometimes said that it must ratify the contract, but, strictly speaking, it cannot and does not ratify. As pointed out by the text-writers and judges, contracts made by promoters for the corporation to be organized cannot in law or in equity be ratified by the corporation when it comes into existence, because ratification implies at least the existence of a person or thing in whose behalf the contract might have been made at the time it was made. Being incapable of binding the corporation when they were made, for the all-sufficient reason that the corporation then had no existence, such contracts cannot afterwards be ratified by the body.

It is held, nevertheless, by many courts, that while there can be no ratification of the contract "qua" contract, yet there may be created an equitable liability on equitable funds, or as it is sometimes stated, while it cannot ratify contracts made in its behalf before it had an existence, yet after the corporation comes into existence it can exercise its powers to contract, and may do so by accepting the contracts so made for it, and thereafter adopting them as its own. This last doctrine rests upon the ground that the promoters' contract was in the nature only of a proposal, which the corporation could accept or reject after it came into existence.

It does seem to us to be in keeping with the rules of justice and of law that, where the parties who made the contract intended that the prospective corporation, when formed, should become a party to the undertaking, and intended that the contract should be for the use and benefit of the corporation, and the corporation does accept the benefit, it thereby adopts the proposed contract as fully as if it had been an original party thereto.

[6] In the case at bar the corporation bank availed itself of a subscription made for shares before it was formed, and received the price paid therefor, and issued to the subscriber certificates of stock, thereby treating him as a shareholder. This, as all the authorities hold, was sufficient to bind the subscriber, and we think it ought to bind also the corporation. Its obligations and its benefits ought to be mutual, and to be as binding as if it had made the original contract of subscription by its legally authorized agents. This has been held by this court. Davis v. Montgomery Furnace Co., 101 Ala. 127, 8 South. 496; Moore Co. v. Towers Co., 87 Ala. 206, 6 South. 41, 13 Am. St. Rep. 23; Cook on Stocks, § 707.

We have examined a number of cases in which subscriptions to capital stock have been canceled by courts of equity, where the subscription was procured by the fraud of agents after the corporation was formed; and it seems to us that the same rules should apply to other cases except where their application would prejudice the interests of other subscribers. As to these cases, see Southern States Fire, etc., Co. v. Whatley, 173 Ala. 101, 55 South. 620; Southern States Fire, etc., Co. v. Tanner, 180 Ala. 30, 60 South. 81; Southern States Fire, etc., Co. v. Brannon, 198 Ala. 115, 59 South. 60; Alabama, etc., Works v. Dallas, 127 Ala. 513, 29 South. 459; Southern States Fire, etc., Co. v. Cromartie, 181 Ala. 295, 61 South. 907; Southern States Fire, etc., Co. v. Wilmer Store Co., 180 Ala. 1, 60 South. 98; Garner v. Hall & Farley, 114 Ala. 166, 21 South. 835.

In the case of Planters' & Merchants' Co. v. Webb, 144 Ala. 666, 39 South. 562, the subscriber was held liable, though no formal subscription was entered and there was then no corporation, and in that case it was said:

"That 'a subscription for stock implies a promise to pay for it, even though the subscription was before incorporation is the rule sustained by the great weight of authority.' 1 Cook on Corp. §§ 71, 75; 26 Am. & Eng. Ency. Law, 902; 1 Morawetz on Corp. 47, 54. A subscriber may be bound by an actual subscription made before incorporation, or organization, although he makes no cash payment, and the proceedings after incorporation are without notice to him. 26 Am. & Eng. Ency. Law, 902.

" 'A direct subscription to take stock may be enforced by the corporation, even though such subscription was made prior to the incorporation. An agreement reading, "The undersigned hereby subscribe for the number of shares set opposite our names," may be enforced by the corporation when it is formed.' Id. §§ 73, 75.

" 'When an action is brought to collect a subscription, either directly or indirectly for the benefit of the corporate creditors, it is well established that the subscribers cannot defeat such action by the defense that the corporation

was not an incorporation, by reason of its not having fully complied with the terms of the statute providing for such an incorporation. Not only is the subscriber estopped by the act of subscribing from setting up this defense, but he is bound also by the rule that the existence of a corporation cannot be enquired into except by a direct proceeding in behalf of the State.' Id. 184."

If the subscriber should be so held to the agreement with the promoters, it does seem that, so far as the corporation itself is concerned, it ought to be so held.

The case of Broadus v. Russell, 160 Ala. 353, 49 South. 327 (Id., on former appeal, 39 South. 712, not officially reported), dealt with the liability of promoters and of the corporation, and with the rights and liabilities of subscribers, under guaranties or warranties made by the promoters to the subscriber as to acts to be done in the future by the corporation, but is not decisive of the question here involved.

[7] This case, so far as this particular phase of it is concerned, in our opinion falls within the rule that, when contracts are made for the benefit of another, but without his agency or even his consent, they may be either rejected or accepted and affirmed by him, and that, if he accepts, he adopts the bad as well as the good, the burden as well as the benefit. And if he seeks to enforce such a contract, it may be impeached or rescinded on account of the fraud or wrong of the party making the same for him, just as if he or his agent had made it; and where he has accepted the benefits of it, he may be by the other party required to bear the burden thereof.

The New Hampshire court thus states the rule:

"Fortunately the justice of this case is the law of it. I take it to be clear law that the defendant cannot affirm the trade made on his behalf by Hutchinson, and so treat him as his agent in the matter to that extent, without, at the same time, adopting the ill-omened means whereby it was brought about. He takes it cum onere, and, unless he can sustain it as a whole, he must be content to see it fall as a whole, and his gains, of course, go with it." Presby v. Parker, 56 N. H. 409, 413.

The New Jersey court, speaking through Beasley, C. J., states the rule thus:

"The action was against the bank for deceit, which was alleged to consist in certain fraudulent representations, charged to have been made on a sale of stock to the plaintiff by the directors of such corporation as its agents. Lord Chelmsford, in giving his views, said: 'The distinction to be drawn from the authorities, and which is sanctioned by sound principle, appears to be this: Where a person has been drawn into a contract to purchase shares belonging to a company, by fraudulent misrepresentations of the directors, and suit is brought in the name of the company to seek to enforce that contract, or the person who has been deceived institutes a suit against the company to rescind the contract on the ground of fraud, the misrepresentations are imputable to the company, and the purchaser cannot be held to his contract, because the company cannot retain any benefit which they have obtained through the fraud of their agents. But if the person who has been induced to purchase shares

by the fraud of the directors, instead of seeking to set aside the contract, prefers to bring an action of damages for the deceit. such an action cannot be sustained against the company, but only against the directors personally.' Lord Cranworth, in his opinion, puts himself on the same ground, and says: 'A person defrauded by the directors, if the subsequent acts and dealings of the parties have been such as to leave him no remedy but an action for the fraud, must seek his remedy against the directors personally.'" Kennedy v. McKay, 43 N. J. Law, 288, 291 (39 Am. Rep. 581).

See, also, Thompson on Corporations, §§ 727, 739; Cook on Corporations, § 140.

In our case nearest in point this court has thus spoken:

"The general doctrine is well established, and obtains both at law and in equity, that a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights, obligations, and transactions of its stockholders; and this whether said rights accrued, or obligations were incurred, before or subsequent to incorporation. Morawetz on Priv. Corp. 227–234, 547–549; Morrison v. Gold Mt. G. M. Co., 52 Cal. 309; Hawkins v. Mansfield G. M. Co., 52 Cal. 515; Gent v. M. & Mut. Ins. Co., 107 Ill. 658; Caledonian R. Co. v. Helensburgh, 2 Macq, 391; Penn. Mat. Co. v. Hapgood, 141 Mass. 147, 7 N. E. 22.

"There is a class of contracts, however, which are entered into between the promoters or prospectors of a contemplated corporation and third persons, on the faith of the corporation, intended to inure to its benefit, and which in point of fact do inure to its benefit, on which the corporation will be charged, even in the absence of an express promise to perform, or ratification on the part of the company after it is in esse, on 'the familiar principle that one who accepts the benefit of a contract, which another volunteers to perform in his name, and on his behalf, is bound to take the burden with the benefit.' Redfield on Railways (5th Ed.) 18; Edwards v. Grand Junc. R., 1 M. & Cr. 650; Stanley v. Birkenhead R., 9 Sim. 264; L. R. & Ft. S. R. Co. v. Perry, 37 Ark. 164; Perry v. L. R. & Ft. S. R. Co., 44 Ark. 383; Bommer v. Am. Spiral Co., 81 N. Y. 468." Moore Co. v. Towers Co., 87 Ala. 210, 211, 6 South. 43 (13 Am. St. Rep. 23).

The above case is reported in 13 Am. St. Rep. 23, with an extensive note thereto.

Is the complainant a "third party" within the meaning of the expression used above, or entitled to the protection of such party? If he is, is he entitled to relief in equity as well as at law?

The next cases nearest in point are Rives v. Montgomery S. P. R. Co., 30 Ala. 92, and Montgomery Southern R. Co. v. Matthews, 77 Ala. 357, 364, 365 (54 Am. Rep. 60). In the latter case the former is construed and its holding readopted, and therein it is said:

"In Rives v. Montgomery South Plank Road Co., 30 Ala. 92, the suit was on a subscription to the capital stock of the Plank Road Company. The defense was fraud in procuring the subscription. On the trial 'the defendant offered to prove that, before he subscribed for any stock in said company, and before its organization under its charter, two of its subscribers for stock, one of whom was afterwards elected president and the other secretary of the corporation, represented to him that the road would be so located as to pass through his plantation, thereby greatly enhancing the value of his land, that these representations were repeated by them after their election to their respective offices,

and thereupon defendant subscribed for five shares of the capital stock of said company, and that said road, as afterwards located, did not pass within five miles of defendant's plantation.' This testimony was rejected by the court, on plaintiff's motion; and the propriety of that ruling was the sole question presented in this court. In passing on that question, the majority of this court said: 'We cannot doubt that the declarations of those officers, as offered by the defendant, were relevant and admissible. Those declarations certainly throw some light upon one of the material questions in the case; and to exclude them is to deny, practically, to the defendant the right to prove the very basis on which he rests his defense. Until these declarations are proved, it is impossible to show that they were false, or that they formed an inducement to the defendant to subscribe.' It will be observed that in the above case we did not decide that the representation, even if not kept and conformed to as a promise, was in itself sufficient to avoid the subscription. That question was not before us. We simply held that it was legal evidence—a predicate for further testimony." M. S. R. Co. v. Matthews, 77 Ala. 364 (54 Am. Rep. 60).

"There can be no question that, if the stock subscription in this case was procured by the fraud of Kirkpatrick, the soliciting agent, the railroad corporation, claiming the benefit of the subscription, must take it tainted with Kirkpatrick's fraud. Story on Agency, § 253; Corning v. Southland, 3 Hill (N. Y.) 552; Mead v. Bunn, 32 N. Y. 275; Harris v. Delamar, 3 Ired. Eq. (38 N. C.) 219; Meadows v. Smith, 7 Ired. Eq. (42 N. C.) 7." Id., 77 Ala. 365 (54 Am. Rep. 60).

In a later case it is said:

"In Mont. So. Ry. Co. v. Matthews, 77 Ala. 364 [54 Am. Rep. 60], it was said by this court, speaking through Stone, C. J.: 'An opinion expressed, even if not realized, cannot, without more, become a fraudulent representation. If, however, such opinion is falsely expressed, with intent to deceive, and does deceive, this constitutes such opinion or representation a false statement of fact, and vitiates a contract thereby procured, unless the representation relates to a matter equally open to both parties. This could not deceive.' Lake v. Association, 72 Ala. 209; Bradfield v. Elyton Land Co., 93 Ala. 527 [8 South. 383]; Birmingham Warehouse, etc., Co. v. Elyton Land Co., 93 Ala. 549 [9 South. 235]; Thompson on B. & L. Ass'n, p. 178, note." Johnson v. Nat. B. & L. Ass'n, 125 Ala. 465, 482, 28 South. 2, 6 (82 Am. St. Rep. 257).

[8] There can be no doubt that the fraudulent representations as averred in this bill belonged to a class authorizing the rescission of a contract made on the faith of them.

The Michigan courts, while announcing the same general rules as recognized by our court, denied relief solely on the ground that the promoters or organizers of the corporation were not its agents, and that the corporation was not bound by their frauds or representations. The court spoke thus on the subject:

"This is an attempted application of the rule that, by accepting the benefits of a contract made by an agent, the principal is bound by the undertakings and promises of the agent. A number of cases are cited to sustain this contention, which manifestly must rest upon the proposition that the citizens' committee was an agent of the company which its efforts created. Among the cases cited are many which support the general rule above stated, viz. that a principal must assume the obligations, if he wishes the benefits, of an unauthorized contract made by an agent. As stated by Paley: 'Contracts made for the benefit of another, but without his privity or direction, may be rejected or affirmed at his election. But, by making the election to affirm it, he adopts the agency altogether, as well that which is detrimental as that which is for his benefit. But, in seeking to enforce contracts entered into by agents, the principal is subject to have them impeached by any conduct of his agent which would have had that effect if proceeding from himself. Every species of fraud, misrepresentation, or concealment, therefore, in the agent, affects the principal's right to recover.' Paley on Agency, 324; Hitchcock v. Griffin, 99 Mich. 451 [58 N. W. 373], 41 Am. St. Rep. 624." St. Johns Mfg. Co. v. Munger, 106 Mich. 90, 64 N. W. 3, 29 L. R. A. 63, 58 Am. St. Rep. 468, 471, 472.

"The promoters were persons who represented the meeting, or possibly themselves, or some prospective stockholder, who, for purposes of his own, desired to see the corporation organized. They cannot be said to be agents of the corporation in any sense. These subscribers contracted with each other to form a corporation, which they did. If one was guilty of fraud upon the others in procuring their subscriptions, a remedy should exist against such person. Doubtless a subscriber who is induced by fraud to agree to join in the organization of a corporation may refuse to do so on discovering fraud; but, by carrying out his agreement and uniting with others, he has assumed new relations with them and the public, after which his remedy is restricted to action against the wrongdoers. See 4 Am. & Eng. Ency. of Law, 201, and notes; Carmody v. Powers, 60 Mich. 26 [26 N. W. 801]." Id., 106 Mich. 95, 64 N. W. 5, 29 L. R. A. 63, 58 Am. St. Rep. 473.

The Indiana court seems to have held with the Michigan court. See Shick v. Citizens Enterprise Co., 15 Ind. App. 329, 44 N. E. 48, 57 Am. St. Rep. 230, and note. We do not mean to say that these are the only courts so holding.

The Virginia court seems to hold to the contrary, and in line with what this court has said, see 44 Am. St. Rep. 942, where the court says:

"The authorities are abundant in support of the general rule that a person fraudulently induced by an agent of a corporation—and a promoter is an agent—to subscribe to its capital stock, may, at his option, repudiate the contract; and a fraud may consist as well in the suppression of what is true as in the representation of what is false. Indeed, the law is that, where the person solicited to subscribe has no other information on the subject than that which the agent chooses to convey, the statements of the agent ought to be characterized by the utmost candor and honesty. 1 Cook on Stocks and Stockholders (3d Ed.) § 147; Crump v. United States Min. Co., 7 Grat. (Va.) 352, 56 Am. Dec. 116; Bosher v. Richmond, etc., Land Co., 89 Va. 455, 16 S. E. 360, 37 Am. St. Rep. 879; Directors, etc., v. Kisch, L. R. 2 H. L. App. Cas. 99." Virginia Land Co. v. Haupt, 90 Va. 533, 19 S. E. 168, 44 Am. St. Rep. 939.

It seems to us that there is no sound reason why a subscriber should not be allowed to rescind a contract which was induced by the fraud of the promoters, even before the corporation was formed, if the contract was made for the use and benefit of the corporation, and it did so use it and receive the benefits of it. If the promoters are not, strictly speaking, agents of the corporation, they were agencies which wrought the fraud; and

the corporation was the recipient of the fruits of the fraud, and it ought to bear the burdens thereof. The justice of the case ought to be the law of it; and an innocent subscriber who has been so defrauded, if he be diligent, ought to have relief. And so far as this record shows, appellant is both innocent and diligent; and there is no doubt that he has been defrauded without fault on his part.

While it is made to appear that the learned trial judge sustained the demurrer on the ground that the promoters were not agents of the corporation, and that no ratification or acceptance of the contract was shown (as to which ground we have reached a different conclusion), yet, before we reverse the decree sustaining the demurrer, we must see whether or not the decree should be sustained on other grounds.

[9] The question next in importance raised by the demurrer is that, the bill showing that the corporation had gone into the hands of the state bank superintendent for liquidation before the filing of the bill, the bill contained no equity, whatever of equity it might have contained had the bank been a going concern. This seems to be, or at least once was, the law of England. This strict English rule seems not to prevail in America to its full extent. The American rule is thus stated by Mr. Cook and Mr. Thompson in their valuable works on Corporations, and the text is borne out by many decisions, state and federal, cited in notes:

"It seems to be the rule in this country at least that a defrauded subscriber may rescind such subscription after insolvency if he had not had a reasonable time to examine into the affairs of the corporation before such insolvency or before the appointment of a receiver. This rule was expressly recognized by the United States Circuit Court." 1 Thomp. Corp. (2d Ed.) § 735.

"A bill in equity to rescind a fraudulent sale of stock by a corporation lies, even against the receiver of the corporation." 1 Cook, Corp. (6th Ed.) § 356.

[10] It appears that in America such a bill lies even against the receiver of a corporation or an assignee under a general assignment, and that the fact of insolvency does not ipso facto prevent equity from awarding all relief under such bill; hence, if the bill should allege insolvency (which this bill does not do), it might, with other averments such as are contained in this bill, contain equity. Such a bill must, of course, show that the complainant acted promptly after the discovery of the fraud, that he was not guilty of laches, and that he was guilty of no negligence in discovering the fraud, and that he had not ratified the contract or waived the fraud, after discovery, and had received no benefits thereafter, as a stockholder, in any dividends or profits, all of which this bill does, in the fullest and most specific terms. The bill certainly acquits the complainant of any neglect, wrong,

or delay in the filing of his bill, or in the discovery of the fraud sought to be relieved against.

It may be true that in cases where the rights of creditors intervene, their rights may be superior to the rights of some or all of such stockholders, or it may be shown that the complainant is estopped as against some or all of such creditors; but these matters do not now appear on the face of the bill, and it is not required that the bill should negative such facts.

[11, 12] It is true the bill alleges the bank to be in a failing condition, and is being liquidated by the state bank superintendent, and the bill is against that officer. This averment was only necessary to give the bill equity as against such officer, not as against the bank. It is not at all necessary that the bank be insolvent before it can be taken over by such officer.

[13] The only creditors of the bank shown by the bill are those whose debts were taken over by the new corporation when formed, and which were agreed to be taken over before it was formed. They are shown to be creditors of the old bank, and to have been such before the alleged fraud was committed on appellant. It is not shown that there are any creditors subsequent to the issuance of certificates or shares to appellant. There may or may not be such creditors; it is not necessary that the bill negative their existence, or show that they have been, or can be paid in full, and yet allow the relief prayed in the bill. It may also be true that the claims of creditors of the old corporation are superior to the claims of complainant, or there may or may not be funds sufficient to pay all creditors, including the complainant if his relation be transformed from that of stockholder to that of creditor, as prayed in his bill; but it is not necessary that the bill should show these facts affirmatively, or negative prior rights of creditors of either class. These are matters that lie peculiarly within the knowledge of the bank and of the state superintendent of banks, and should be set up in the answer, and, of course will depend upon the proof.

If it is made to appear that the corporation is wholly insolvent, then under our statute making the assets of such corporation a trust fund for the benefit of creditors it may be that no relief can or should be awarded to complainant.

[14] If the contract is rescinded, then the complainant becomes one of the creditors; yet his rights by such change of relation may or may not be secondary to those of all other creditors. This, of course, can be determined only on final hearing on bill, answer, and proof, unless the facts are agreed on or admitted.

[15] There can be no doubt as to the sufficiency of the averments to show fraud; the bill's averments in this respect could scarcely

be made more specific, or stronger, and no laches is shown. If the appellant is not entitled to the relief prayed, it must be made to appear by answer and proof. So far as now appears, he is entitled to some relief. The mere fact (if it be a fact) that the corporation has now no funds which would be availing to· repay all· or a part of the money paid by complainant thereto ought not to prevent his obtaining all relief, or the changing of his status from that of a stockholder to that of a creditor. There may be creditors as against whom he would not be allowed to thus change his status; yet as against the corporation and the promoters it does seem that he should be allowed to effect that change of relation.

Mr. Freeman, in a valuable note to the report of the case of Thompson v. Reno Savings Bank, 3 Am. St. Rep. 797, has collected and reviewed most of the authorities up to that time on the subject; and the following principles deduced therefrom are stated by him:

"The rule that a contract obtained by fraud is voidable at the election of the defrauded party applies to the contract of a shareholder in a corporation. Therefore, if one is induced to subscribe for or purchase shares of stock of a corporation through the fraud of its agents, he may have all the remedies, affirmative and defensive, against the corporation which he might have had against a principal in any other similar case. See Cook on Stock and Stockholders, § 135 et seq.; Thompson's Liability of Stockholders, § 142 et seq.; note to Parker v. Thomas, 81 Am. Dec. 392. But the contract entered into through fraud is voidable merely, and not absolutely void. It is valid and binding until the defrauded party elects to treat it as void. And if he fails to repudiate it before the rights of innocent third parties have intervened, their equities to treat it as valid may be superior to his claim to avoid it." 3 Am. St. Rep. 824.

"Some of the authorities seem to favor the view that in no case can fraud in obtaining the subscription be set up by the subscriber after the insolvency or bankruptcy of the corporation. This may be true under the English companies' act of 1862, by which it appears a creditor is entitled to hold every shareholder whose name is on the register of the company at the time proceedings are instituted to wind up the company for insolvency; but in America there seems to be no reason for the universality of the rule. Thus in Upton v. Englehart, 3 Dill. 496, 505 [Fed. Cas. No. 16,800], Dillon, J., remarks: 'I am inclined to the opinion that if a company has fraudulently misrepresented or concealed material facts, and thus drawn an innocent person into the purchase of stock, he at the time being guilty of no want of reasonable caution and judgment, and afterwards guilty of no laches in discovering the fraud, and he, thereupon without delay notifies the company that he repudiates the contract and offers to rescind the purchase, these facts concurring, I am inclined to the opinion that the bankruptcy of the company subsequently appearing will not enable the assignee to insist that the purchase of stock is binding upon him.'" 3 Am. St. Rep. 825.

The more recent cases are collected in a note to a West Virginia case reported in L. R. A. 1915D, 792.

We are of the opinion that the trial court erred in sustaining the demurrer to the bill as last amended.

Reversed, rendered, and remanded. All the Justices concur.

## On Application for Rehearing.

PER CURIAM. Application for rehearing overruled.

SAYRE, SOMERVILLE, GARDNER, and THOMAS, JJ., concur. ANDERSON, C. J., and McCLELLAN, J., dissent.