**PLASTIC PRODUCTS CORPORATION,**
a Corporation, Plaintiff,

v.

**FILTROL CORPORATION, a Corpora-**
tion, Defendant.

Murdock Tank & Manufacturing Company, a Corporation, Additional Defendant.

Civ. No. 3504.

United States District Court
N. D. Oklahoma.

Dec. 27, 1955.

Byron V. Boone, Tulsa, Okl., and Robert D. Hudson, Tulsa, Okl., for plaintiff and additional defendant.

John H. Saunders, Los Angeles, Cal., and Bradford J. Williams, Fenelon Boesche, T. H. Eskridge, Franklin D. Hettinger, and R. B. McDermott, Tulsa, Okl., for defendant.

WALLACE, District Judge.

This controversy arises out of the sale of certain plastic tanks by Murdock Tank Manufacturing Company, an Oklahoma corporation (the additional defendant) to defendant Filtrol Corporation, a Dela-

ware corporation. Plaintiff, Plastic Products Corporation, an Oklahoma corporation (as assignee in interest of Murdock Tank's rights under such sale) initiated this action to recover from Filtrol an alleged unpaid balance on the tanks' purchase price. In answering, Filtrol denied it owed any balance because of such transaction; and urged a counterclaim against Plastic Products and a cross-claim against Murdock Tank to obtain damages allegedly sustained by Filtrol because of the failure of the tanks to live up to express and implied sales warranties.

Specifically, Filtrol asserts that it is not obligated to pay for the four plastic tanks delivered under the contract of sale inasmuch as said tanks, when erected, failed to hold liquid and proved completely incapable of being used. Filtrol asks to recover the partial payment on the purchase price, already made, monies expended in an effort to make such tanks usable, and damages sustained because such tanks were not only delivered later than called for under the sale agreement, but had to be replaced by other tanks before Filtrol's new chemical plant could engage in full-scale operations. Plastic Products argues that the unpaid balance of the contracted-for purchase price is owed inasmuch as any failure of the tanks in question is traceable to improper erection by Filtrol and is not due to manufacturing defection; in addition, Plastic Products asserts that the tanks in question represented a joint experiment of Murdock Tank and Filtrol and that no warranties accompanied the tanks' sale.

The evidence indicates that Plastic Products and Murdock Tank are separate corporations which operate from the same business site in Tulsa, Oklahoma. During the time pertinent to this litigation F. Lee Murdock was president of both corporations, owning a majority of the stock in Murdock Tank and 25% of the stock in Plastic Products. For the most part, the stockholders of the two companies are different. Plastic Products was organized to produce plastic tanks, whereas Murdock Tank is primarily a producer of steel tanks. All plastic tanks manufactured by Plastic Products were sold to Murdock Tank at a discount from the price to the customer; and, Murdock Tank made all sales, profiting to the extent of the discount.

The defendant, Filtrol, is a manufacturer of chemical products with plants located in Mississippi, Utah and California. At Los Angeles it has operated a plant producing a catalyst for the petroleum industry. A waste product of the catalyst plant is an effluent from which substantial quantities of valuable chemical materials are recoverable. The tanks in question were purchased to be used in a new six million dollar plant, of Filtrol's, at Vernon, California, which new plant recovers ammonium sulphate (commercial fertilizer) and high purity alumina microsphere (used in the manufacture of high octane gas) from the waste product of the Los Angeles catalyst plant.

Negotiations for the purchase of the plastic tanks in question began around March 1, 1953. These negotiations included oral conversations between representatives of Murdock Tank and Filtrol along with the exchange of letters and literature. On May 26, 1953, Filtrol agreed in writing to purchase six 750 barrel plastic tanks for $6,850 each, f. o. b. Tulsa. Four of the tanks (those to be used in the "adjusting process" in the new plant) [1] were to be fitted with stainless steel bolts and to have Teflon gaskets; the other two tanks were to be

---

1. The adjusting process of the instant operation performs three functions: (1) Either sulphuric acid or alumina is added, but never both, in order to obtain the correct chemical content and ratio; (2) The free acid present in the effluent must be neutralized with ammonia; and, (3) The ferric form iron present in the effluent must be reduced to ferrous form to enable a washing out of the iron and an obtaining of high purity alumina. Tanks used for such adjusting must have agitators and recirculating systems, and be of sufficient size to allow complete chemical analysis of the liquor.

of Murdock Tank's standard construction. Filtrol agreed to pay a total of $41,000 for the six tanks, plus the cost of Teflon gasketing and stainless steel bolts to be used on the four "adjusting" tanks and the cost of freight for all tanks from Tulsa to the Vernon site. Murdock Tank agreed to deliver the tanks "not later than July 15, 1953"; however, because of manufacturing difficulty the first tank parts were not shipped until November 10th; and the second tank was not shipped until November 20th. Tanks numbers 3 and 4 were shipped several weeks thereafter. Tanks 1 and 2 were erected first. However, when the first two tests of these tanks proved unsuccessful, in order to get the plant in production, Filtrol temporarily by-passed the adjusting stage;[2] and, tanks 3 and 4 were assembled and erected for use in a separate phase of plant operation. Upon installation, tanks 3 and 4 contained numerous small leaks and weeps, but it was thought that such tanks would be usable;[3] and, Filtrol paid Murdock Tank something in excess of $12,000 for these two tanks, withholding $1,000 pending final acceptance. On February 11, 1954, while tanks 1 and 2 were still being worked on in an effort to put them in usable condition, Filtrol cancelled its order for the undelivered tanks (numbers 5 and 6).[4] On March 10, 1954, after the final of four tests, Murdock Tank was notified by letter that tanks 1 and 2 had been removed and discarded; and, a return of the tanks was tendered. Several months thereafter, due to their inability to contain liquids, tanks 3 and 4 were replaced by tanks of another manufacture.

Although plaintiff, Plastic Products, makes much of an alleged careless and inefficient assembling and erecting of the tanks, the court is satisfied that basically the failure of these four tanks is attributable to faulty design and manufacture rather than careless erection. Unquestionably, the installation of tank number 1 was accomplished amid considerable irregularity; and, if tank number 1 had been the only tank to fail to contain liquid, forceful argument could be advanced that the contested shortcomings arose because of improper erection technique.[5] However, such a claim takes on the frivolous when considered in the light of Filtrol's experiences with the other three tanks. All of the tanks showed a fundamental deficiency and leaked countless numbers of places along the seams and vertical connections. In addition, at the time of the fourth test of tank number 1, the mere circulation of fluid therein resulted in a "breathing" of the tank, immediately followed by increased leakage; and, tank number 4, although used for a short time in spite of small leaks progressively increased in leakage at the joints, and after several months developed holes near the bot-

2. Although the omitting of the adjusting step in the process markedly impaired effective recovery of desired chemicals from the effluent in question, quantities of amonium sulphate were obtainable by adding excess sulphuric acid to the system. Also, some alumina was recoverable but it contained a considerable amount of iron thus precluding a recovery of high purity alumina.

3. Tank number 3 was to be used to contain distilled water; and, tank number 4 was to hold a magnesia solution.

4. Under "Terms and Conditions" of the agreement, Filtrol reserved the right to cancel the order "or any portion of same" if delivery was not made when and as specified.

5. At the time of the first test a small sharp stone was found pinned between the bottom of the tank and the concrete box located under the tank for the bottom-hole outlet. After a second test the tank was jacked up and removed in order that the concrete box could be replaced with a floating steel box. Subsequently, the cement used to join the plastic sections was scraped off and replaced with a more flexible cement. The tank was again removed from the site and a concrete mat foundation was installed to replace the prior compacted earth, coarse aggregate and sand filled base. The tank was again jacked up to remove a 2″ x 4″ piece of lumber used as a form for the laying of the concrete mat foundation.

tom seam of the tank from which jets of water poured.[6]

■ Also, not without significance, is the fact that the erection of the instant tanks was done under the direct supervision of men furnished by Murdock Tank as construction specialists to assure competent installation. In its complaint, Plastic Products asks to recover $4,166.50 for services rendered by Murdock Tank employees as experts in the assembling and erecting of these tanks.[7] Consequently, even if any of the failures in question were traceable to negligent installation the negligence would be imputable to Murdock Tank through the channel of its agents; and, Plastic Products (as assignee of Murdock Tank's rights) would stand in no position to successfully insist on purchase price payment for products unusable because of such careless erectings.

■ Alternatively, much of Plastic Products' evidence is directed at establishing that Filtrol was a partner in the experimental adaptation of plastic tanks to the chemical industry; and, that the experiment having failed, Filtrol cannot now be heard to complain or assert that warranties of fitness accompanied the sale. However, the clear preponderance of all persuasive evidence introduced contravenes such a theory. From the outset, Murdock Tank assumed the position of one in the sales promotion and marketing field, earnestly urging the acceptance of its product and emphasizing the commodity's commercial virtues.[8] There is no evidentiary intimation that Murdock Tank and Filtrol were joint adventurers in an experimental operation. When the first face to face conversation was had between Filtrol's and Murdock Tank's representatives, the negotiations had already reached the point of actual quotation of specification, of price and of delivery date. The discussions which followed were directed at working out the details surrounding actual delivery and use. Although prior to manufacture

6. The reasonable inference from the testimony of Plastic Product's own factory superintendent is that manufacturing design rather than method of installation caused the controverted failures; this testimony was:

"Q. You haven't made a 750, attempted to make a 750 barrel tank since your experience with Filtrol, have you? A. No, sir.

"Q. Why not? A. I don't think we are ready yet.

"Q. Were you ready when you sold them to Filtrol? A. I don't think so."

7. These specialists were furnished pursuant to the original letter quotation of tank cost sent Filtrol by Murdock Tank on May 4, 1953, providing in part: "The above price does not include special gasketing and supervision. Erection supervision charges would be at the rate of $5.00 Per Hour, plus transportation and expenses."

8. A 1952 advertising brochure by Murdock Tank on plastic tanks which came to the attention of Filtrol officials contained, among others, the following representations: (1) "Absolutely impervious to all corrosive elements." (2) "Has great impact resistance and dimensional stability." (3) "At last—a tank that ends corrosion and maintenance problems."

(4) "Here at last is the tank that comes as close to perfection as you can get." (5) "* * * loosening of joints and connections is eliminated." (6) "All tanks built to API (American Petroleum Institute) bolted tank specification." (7) "Glass reinforced plastic is made as strong as any material now used for storing crude oil." (8) "* * * reinforced plastic has great impact resistance and dimensional stability and maintains its molded shape and size under severe stresses and temperature extremes, the loosening of joints and connections is eliminated." (9) "Sizes available: 250 low, 500 high, 750 3-ring, 500 low, 1,000 high, 1500 3-ring, 2,000 high, 3,000 3-ring". In addition under "specifications" the strength against burst is quoted at thirty thousand pounds per square inch. Also, another brochure published sometime in 1952 asserted "Now * * * a new storage tank for industry" and specifically listed among others the Oil Industry (Production and refining) and the Chemical Industry. Moreover, a letter from Murdock Tank to Filtrol dated March 23, 1953, mentioned that the tanks "appear to provide the most economical form of tankage known to date for handling such material as aluminum sulphate, plating solutions, dilute acid concentrations and etc."

and delivery certain technical changes in design were effectuated such alterations were categorically presented by Murdock Tank as merely improvements on a product already commercially desirable.[9] Filtrol's only calculated risk, taken outside the pale of warranty, touched whether the specific liquid chemical to be used by Filtrol (including the temperature thereof) would excessively corrode or in any other way deleteriously react on the plastic material. On such question Filtrol made special tests and satisfied itself that the plastic in question would not unfavorably respond to such use. Naturally, if the failures in question were in any way related to the particular fluids stored therein, a serious question of experimentation, outside the scope of sale's warranties would exist; however, as noted earlier, the merchandise shipped would not contain cold water and the tanks' lack of utility was in no way brought about because of a specialized use by the buyer. Filtrol, in purchasing these tanks for an admitted new application and purpose, nonetheless did, and rightly could, assume that the tanks would contain liquid. The purchase agreement specifically guaranteed manufacturing workmanship and material;[10] yet, from the time of delivery and erection the goods delivered did not qualify as *tanks*, but were merely nondescript articles which demonstrated intolerable leakage and general manufacturing inferiority. In addition to seam leakage the plastic sections themselves fell far below the represented tensile strength.

The court is of the opinion that Murdock Tank has breached both express and implied warranties of sale. Under the purchase contract the express warranties existed for one year. Moreover, an implied warranty of fitness to contain liquid accompanied the sale of the controverted merchandise.[11]

Because of such breaches, Filtrol is entitled to recover the partial purchase price payment already made; and, is further entitled to remuneration for sums expended in a good faith effort to render the merchandise usable as tanks.[12] However, Filtrol is not entitled to damages because of the late delivery of the four tanks in question, or because of the inconvenience and delay precipitated by the failure of the tanks to measure up to the warranties. As to the delay in delivery, although the mere acceptance of goods, late upon arrival, does not of itself amount to a waiver of

---

9. As mentioned in a letter to Filtrol from Murdock Tank, dated July 29, 1953: "Under separate cover, we are sending you a sample cross-section of the new patented stave joint which has 100% plus efficiency compared with 30% efficiency on our present design. This will be incorporated in your tanks which are scheduled for shipment October 15, 1953."

10. Under "Terms and Conditions" dealing with QUALITY, the agreement provides "all material furnished must be as specified." Also, it is stated: "the Seller guarantees all material and equipment furnished to be free from defects and faulty workmanship and agrees to replace or satisfactorily repair without charge to Buyer * * * all or any parts thereof which may develop defects within one year from date of shipment".

11. It is fundamental that regardless of a more restrictive express warranty, there is an implied warranty that the goods sold must be suitable to perform the ordinary work for which the article is made. Fairbanks Morse & Co. v. Miller, 1921, 80 Okl. 265, 195 P. 1083; G. M. C. Truck Co. v. Kelley, 1924, 105 Okl. 84, 231 P. 882. Cf. Wallace v. L. D. Clark & Son, 1918, 74 Okl. 208, 174 P. 557, 21 A.L.R. 361.

12. "Where there is a total breach of an implied warranty of fitness of personal property for a particular purpose, which renders the property valueless or worthless therefor, so as to be of no benefit to the purchaser * * * the measure of damages is the price paid * * * including the cost of unloading and transportation, and the actual expenses incurred in the effort in good faith to use the property for the purpose of purchase." Markle v. Stekoll, 1929, 138 Okl. 171, 280 P. 842, 843, Syl. 3.

 

breach of timely delivery,[13] the general conduct of Filtrol officials over a protracted period of time did effectuate a waiver of the time-for-delivery requirement. The Filtrol representatives did not repudiate the agreement because of the marked delay but consistently indicated they desired to obtain the plastic tanks long after it was obvious there was no chance of prompt delivery; and, the reasonable inference from the evidence is that had the tanks performed the functions for which they were intended, no complaint as to slowness of delivery would have been asserted by Filtrol.[14] In addition, the damages caused by the delay in delivery, and the delay caused by the failure of the tanks to prove usable are too indefinite and speculative to serve as bases for awards. Had the delays in question interfered with a regularly established operating plant, rather than merely interfering with the establishment of the plant, it would have been possible to determine with reasonable certainty the amount of loss directly resulting from such breaches, and damages would be recoverable.[15] Moreover, the evidence submitted as to the probable loss of production of this new plant fails to establish with certainty the *net* loss in dollars emanating from the complained of delays, but for the most part speaks in terms of *gross* production loss.

■ Under its cross-claim, Filtrol is entitled to judgment against Murdock Tank for $38,946.25.[16] Filtrol is not entitled to judgment against Plastic Products on the counterclaim inasmuch as although Plastic Products and Murdock Tank were closely associated in business operations they remained separately definable legal entities; and, Filtrol's right to recover is based exclusively on its sales agreement with Murdock Tank.

Within 15 days counsel should submit a journal entry which conforms with this opinion.

---

13. See Cushman Motor Works v. Kelley, 1918, 70 Okl. 208, 173 P. 1042; Stearnes Co. v. Robins, 1926, 114 Okl. 156, 245 P. 63; and, 46 Am.Jur. § 262, p. 447.

14. Cf. Christenson v. Gorton-Pew Fisheries Co., 2 Cir., 1925, 8 F.2d 689.

15. "As a general rule, anticipated profits of a commercial or other like business are too remote, speculative, and dependent upon uncertainties and changing circumstances to warrant a judgment for their loss. The exception to this rule is that the loss of profits from the destruction or interruption of an established business may be recovered, where it is made reasonably certain by competent proof what the amount of the loss actually is; and such damages must be established, not by guess work, conjectures, uncertain estimates, or mere conclusions, but by tangible facts from which actual damages may be logically and legally shown or inferred." Keener Oil & Gas Co. v. Stewart, 1935, 172 Okl. 143, 45 P.2d 121, Syl. 2. Also, see City of Collinsville v. Brickey, 1925, 115 Okl. 264, 242 P. 249.

16. This figure includes $7,396 (erection of tanks 1 and 2); $13,922 (repairs to tanks 1 and 2); $920 (removal of tanks 1 and 2); $2,344 (erection of tanks 3 and 4); $731 (repair of tanks 3 and 4); $635 (removal of tanks 3 and 4); and, $12,998.25 (monies paid by Filtrol on tanks 3 and 4).