[Civ. No. 13770. First Dist., Div. One. Nov. 17, 1948.]

WILLIAM G. RUTHERFORD, Respondent, v. STANDARD ENGINEERING CORPORATION (a Corporation) et al., Appellants.

Melvin, Faulkner, Sheehan & Wiseman for Appellants.

Phillip A. Kennedy, Leonard J. Bloom and Price & Morony for Respondent.

WARD, J.—This is an appeal by defendants Standard Engineering Corporation, a corporation, Leibert & Caletti, a copartnership, Jack Leibert, Carlo Caletti and Elmer Asbell, and cross-complainant Standard Engineering Corporation, from the whole of the judgment rendered in favor of plaintiff

and cross-defendant William G. Rutherford after verdict by a jury, wherein plaintiff was awarded $8,400 against defendants, and the cross-complainant failed to recover on the cross-complaint.

The action was consolidated for trial with two other cases, not identical, but similar in many respects in the pleadings, the evidence and the law as set forth in instructions to the jury. A separate verdict was returned in each case.

The complaint alleges that the Standard Engineering Corporation, Leibert & Caletti, a copartnership, and Leibert and Caletti individually, were doing business in California with their respective principal places of business located in San Rafael, California. Subsequently Elmer Asbell, vice president of the corporation, was served as a defendant and duly appeared by answer.

Primarily the basis of the action is fraud. The complaint alleges that ''On or about March 15, 1946, at San Rafael, California the defendants, and each of them, with intent to deceive and defraud plaintiff, and to induce plaintiff to purchase land on which defendants' prefabricated houses could be erected, and to enter into an exclusive agency contract with defendants for the erection and sale within Marin County, State of California, of prefabricated housing units to be manufactured by defendants, falsely and fraudulently represented to plaintiff as follows: (1) That the defendants then and there had the manufacturing facilities to manufacture and deliver to plaintiff, and would immediately manufacture for and deliver to plaintiff, not less than ten (10) prefabricated houses per month. (2) That the sale price per house to plaintiff would be Three Thousand Two Hundred Dollars ($3,200) f.o.b., defendants' plant at Sacramento, California. (3) That defendants had obtained Federal Housing Authority approval of such prefabricated houses. (4) That defendants had theretofore obtained National Housing Administration approval for material priorities for the manufacture and sale of said prefabricated houses. (5) That defendants had theretofore obtained the approval of the California State Veterans Administration for the sale of said prefabricated houses to veterans. [This allegation was deleted by an amendment filed with the approval of the court and the consent of counsel for defendants.] (6) That the defendants then and there had made the necessary contracts for materials to manufacture and deliver to plaintiff a minimum of ten (10) prefabricated houses per month. (7) That the Bank of America National Trust &

Savings Association had agreed to finance the erection and sale of said houses at Seven Dollars and Fifty Cents ($7.50) per square foot. [This allegation was also deleted.] (8) That defendants had theretofore obtained United States Office of Price Administration approval of the sale price of said prefabricated houses to plaintiff and of the sale price of said houses from plaintiff to the ultimate purchaser. (9) That plaintiff would be given the exclusive right to erect and sell said prefabricated houses within the County of Marin, State of California. [This allegation was changed to cover only southern Marin County.]

"Plaintiff believed said representations to be true and was induced by said representations to purchase land within Marin County for the erection of one of said prefabricated houses for the sum of $2,000, to secure a title insurance policy on said land for the sum of $47.70, and to enter into a contract for the erection of one of said prefabricated units thereon for the sum of $4,156.19, which said sum plaintiff paid. After the erection of said house, plaintiff paid the sum of $86.28 for sales taxes; the sum of $277.84 to advertise the sale of said prefabricated units, the sum of $538.75 for landscaping, the sum of $392.76 to prepare said house for public demonstration, the sum of $135.60 for maintenance fees, and the sum of $125.00 for attorneys fees incurred for the preparation of contracts for the erection and sale of said prefabricated units, and the sum of $4846.96 to defendants for said house." The complaint then alleges that plaintiff Rutherford was engaged in the real estate business, with monthly profits of $1,000, and that he suffered a loss in this respect of $3,000, and $300 in traveling expenses; that defendant did not have the facilities to manufacture and deliver the minimum number of prefabricated houses per month; that the sale price was $3,678.99; that the necessary approval of the Federal Housing Administration and the National Housing Administration Office of Price Administration had not been obtained.

The second cause of action alleges that "defendant Standard Engineering Corporation was and now is the alter ego of defendants Jack Leibert and Carlo Caletti in that (a) said Leibert and Caletti, at the time of said representations, owned or controlled all of the outstanding stock of said corporation; (b) said Leibert and Caletti exclusively controlled and directed the board of directors, officers, and employees of said corporation; (c) said Leibert and Caletti exclusively controlled and directed the business operations of said corporation; (d) said

Leibert and Caletti received all of the profits made by said corporation; and (e) all of said representations were made by said Leibert and Caletti, and by the agents and employees of said corporation at the direction of said Leibert and Caletti.''

The third cause of action alleges that ''On or about March 15, 1946, the defendants, and each of them, with intent to deceive and defraud plaintiff, and to induce plaintiff to enter into a certain contract for the purchase and sale of certain prefabricated houses to be manufactured by defendants, falsely and fraudulently represented to plaintiff . . .'' This allegation is followed by similar allegations as set forth in the first cause of action—that defendants believed the representations to be true and thereupon entered into a contract.

The third cause of action further alleges that ''Defendants agreed and warranted that the Federal Housing Administration had approved said prefabricated houses.'' Thereafter appear allegations similar to those based on the cause of action for fraud to the effect that plaintiff entered into certain contracts for the sale of prefabricated houses for a price in excess of the contemplated cost and acquired options to build on certain parcels of land.

The third cause of action is followed by another ''alter ego'' cause of action. Finally, plaintiff prays for actual damages in the sum of $50,000 and exemplary damages in the sum of $25,000.

In brief, the causes of action purported to be set forth in the complaint sound in fraudulent deceit, perpetrated with intent to cause plaintiff to enter into an exclusive agency contract, together with breach of contract based upon a warranty. A cause of action upon the theory of ''alter ego'' is attached to each main cause of action.

The evidence, irrespective of apparent inconsistencies and contradictions, will be stated favorably to plaintiff. The following pertinent features of the narrative are quoted from plaintiff's brief: ''Rutherford has been in the real estate and insurance business in Mill Valley for several years. In March, 1945, Rutherford visited a prefabricated house that had been erected by Standard on Sir Francis Drake Boulevard, San Anselmo. Thereafter, he visited the office of Standard in San Rafael a number of times, in connection with obtaining an agency; he talked both to Asbell and Caletti. In these various meetings, Caletti stated that they required approvals and would have to obtain priorities to go into the prefabricated house business; he mentioned N.H.A. and F.H.A. and said that

they were in the process of getting these approvals. On or about March 15th, 1946, Caletti said to Rutherford that they had everything now and were ready 'to shoot.' It was at that time Rutherford asked for the agency, and arranged for a present distributorship for Southern Marin. Caletti stated to Rutherford at that time, in so many words, that he had *F*.H.A. approval for the construction of the house. . . . Caletti stated at this meeting that they had *N*.H.A. approval also. . . . Caletti stated to Rutherford that they had a plant at Sacramento and that they were going to be able to turn out 75 to 100 houses a month and that those appointed would get their proportionate shares. . . . Caletti informed Rutherford that the latter would have to put up the model house in order to get the agency and *Rutherford agreed to do so*. The first mention of a time of payment for the house was after July when Caletti said that payments were to be made on the 10th of the month following delivery. Rutherford agreed to take, and Caletti agreed to supply, 10 houses a month as a minimum. Caletti gave Rutherford at this meeting the price of $3,200 for everything except the foundations and excluding the various items not required under the other contracts. In dealing with Rutherford, Caletti gave him the figure of $3,200, plus freight, as a maximum price. . . . Woodley B. Smith was hired by Rutherford as contractor. . . . Prior to the delivery of the model house, Rutherford and Wilson called at the office of Caletti in San Rafael, where Caletti was informed that Smith was to do the contracting work for Rutherford. Rutherford bought a lot, paying $2,047 therefor and graded it at the cost of $149. The packaged house was delivered on June 11, 1946 and placed upon the slab theretofore erected by Smith. The panels or parts were erected by a crew of Standard. . . . From the period extending from July 9th to August 1st, 1946, Rutherford received orders for 16 houses. He informed both Caletti and Asbell of these orders and they said it was fine to get some more. Neither of them said anything about any inability to deliver. It was necessary for Rutherford to return in the neighborhood of $5,000 which had been deposited under these contracts. The bill rendered to Rutherford for his model house was in the sum of $4,933.24. . . . He gave a note to Standard in this amount and thereafter, on September 6th, paid $1,000 on this note, and gave a note for the balance. The latter is the subject of the cross-complaint in the Rutherford action. . . . By a letter under date of July 3rd, 1946, Rutherford ordered 10 houses for July, 15 for August and 15 for

September. There was neither conversation nor writing in response to the letter and the defendants did not say that they could not deliver. . . . Rutherford himself endeavored unsuccessfully, to arrange financing at the Bank of America. He took this up with Caletti, who said, 'there must be some mistake.' . . . Thereafter Caletti kept saying to Rutherford, 'Don't worry. Everything will be taken care of.' . . . In the mind of Rutherford, Caletti's positive statement at the barbecue meeting—as to *F*.H.A. approval—was confirmation of his previous statement that 'everything will be taken care of.' '' Other statements are set forth in respondent's brief but they appear to be elaboration of the evidence in argumentative form.

It may be well preliminarily to dispose of several contentions presented by defendants which do not impress this court as meritorious. They contend that the contracts are so uncertain as not to constitute agreements enforceable in law. It is claimed that the territory was not specifically designated, the number of units to be purchased was indefinite, the price to be paid and the time of payment, together with the time of termination, were not explicitly stated. The answer to the contentions is—did the contracting parties understand each other without indulging in surmise? The trend of recent decisions indicates a policy of upholding contracts if a reasonable construction may be reached that the intention of the parties was mutually understood and readily may be ascertained. (*Roy* v. *Salisbury*, 21 Cal.2d 176 [130 P.2d 706].) The court instructed: ''Plaintiffs have alleged that defendants entered into distributor contracts with them as a result of negotiations between plaintiffs and defendants. If you find that all of the terms of the alleged contracts were definitely understood by the parties, you may then find that such negotiations resulted in binding contracts even though the parties may have intended that a formal writing embodying the terms of the contract should be executed later.''

On the ''alter ego'' theory, Standard Engineering Corporation was required to produce all of its income tax returns, its minute book and other records. The testimony shows that the Standard Engineering Corporation held the Rutherford note and that the note and the Rutherford check for $1,000 as payment thereon were passed on to Leibert and Caletti. In fact there was no entry in the corporation's books of the $1,000 check. Caletti testified that the bulk of the

money the corporation received found its way to Leibert and Caletti.

The court instructed: "If the corporation is owned, dominated and controlled by an individual or individuals and is used by such individual or individuals to perpetrate a fraud, or accomplish some other wrongful or inequitable purpose, the corporate entity may be disregarded and the acts treated as if they were done by the individual or individuals themselves." That instruction seems to meet the test to determine whether a corporate entity may or may not be regarded as the *alter ego* of the stockholders, at least on the fraud theory. (*Watson* v. *Commonwealth Ins. Co.*, 8 Cal.2d 61 [63 P.2d 295]; *Stark* v. *Coker*, 20 Cal.2d 839 [129 P.2d 390].)

■ One of the questions presented is whether the agreement plaintiff Rutherford sued upon violated the California Contractors' License Law (Bus. & Prof. Code, §§ 7026, 7028, 7030, 7044.) Any person who, without a license, acts in the capacity of a contractor is guilty of a misdemeanor. Rutherford was in the real estate business and was not a contractor or builder. (§ 7026.)

The statute provides as a civil penalty that no compensation may be collected for the performance of an act for which a contractor's license is required. The present suit is not brought by Rutherford to collect compensation for his performance of building houses for parties who are liable for his construction work. Rutherford seeks damages for alleged fraud upon "a deliberate and preconceived plan . . . embarked upon by defendants to mislead and delude [plaintiff Rutherford] by contractual provision and false representation." The effect of Rutherford's contract with defendants was to obtain the exclusive right to purchase prefabricated houses. Defendants in the sale of material were not bound to deal alone with contractors. Rutherford's business was of minor consequence. There is no proof that the contracts violated the Contractors' State License Act. The trial court did not err in refusing instructions on this subject.

■ An error, first in importance, that should be considered is an instruction which reads as follows: "Upon the principle that one is liable for the natural and probable consequences of his own acts, a party knowing the circumstances is guilty of fraud when he negligently, carelessly or with lack of foresight makes representations or commits acts the natural and necessary consequence of which will be such as to cause deception, even though such party acts under the honest im-

pression that he is violating no obligation or invading no right. In fact gross negligence alone may furnish conclusive evidence of fraudulent intent even where there is no actual intention to deceive." The jury was instructed that gross negligence alone may furnish "conclusive" evidence of fraudulent intent even where there is no actual intention to deceive. In *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], a similar instruction using the word "conclusively" was declared to be prejudicially erroneous. In the present case the jury was instructed: "With the exception of conclusive evidence you are the sole judges of the effect or value of the evidence given." The court also instructed that "All instructions are to be considered together."

A similar "conclusive" instruction was given in *Pullen* v. *Heyman Bros.*, 71 Cal.App.2d 444, where at page 452 [162 P.2d 961], it was stated: "The second objection to the instruction is that in lieu of an actual intent to deceive, the jury was told that gross negligence might furnish *conclusive* evidence of fraudulent intent. Evidence is not conclusive unless so declared by the code. (Code Civ. Proc., § 1978.) Conclusive evidence may not be contradicted. (Code Civ. Proc., § 1837.) There is no rule of law which declares that gross negligence conclusively constitutes a fraudulent intent in lieu of an actual intent to deceive. Recently the same word was used in an instruction in the Hobart case, *supra*. The Supreme Court held: 'We find no California statute or decision which requires that knowledge of facts that would prevent reliance must be established by conclusive or unanswerable evidence, and the instructions that such evidence is necessary were erroneous.' "

Plaintiff attempts to differentiate the effect of the instruction in the Hobart and Pullen cases from the present case. The statements made in the two cases condemning the instruction are applicable in the present case.

■ Plaintiff attempts to justify the instruction upon the theory that it was a comment on the evidence. The right of the court to comment on the evidence (Const. of Cal., art. VI, § 19) does not permit the court to state an incorrect rule of law.

■ Next, plaintiff seeks to avoid the effect of the erroneous instruction by claiming that it was cured by other instructions. It is contended that in other parts of the charge the jury was correctly instructed and that any harm which resulted from the "conclusive" instruction was overcome. In support of the last claim, attention is called to the following

two instructions: "It is an essential requisite that the allegedly false representation, whatever be its form, must have been made by the defendants for the purpose and with the design of inducing the particular action which resulted in the alleged damage to plaintiff.

"Promises and representations as to future matters, made in good faith, without intent to deceive and made in the honest expectation that they would be carried out are not fraudulent representations." Representations of future matters, without intent to deceive, are not to be classed with those which relate to past occurrences, such as acts of gross negligence which may be considered as "conclusive" evidence of an intent to defraud. The first part of the instruction relied upon by plaintiff refers to an essential element in the proof of fraud—that there must be a design to perpetrate a fraud, which results in damage. The erroneous instruction is inconsistent with and contradictory of the instructions quoted by plaintiff. When the instructions referred to by plaintiff are read in conjunction with the erroneous instruction the law is not accurately stated, and it is impossible to determine that the jury followed the correct rule. (24 Cal.Jur. § 116, pp. 867-868.)

The instructions stress the element of fraud as appears from the following: That "Each of the plaintiffs has brought suit against defendants on two theories: One that defendants breached a contract with plaintiffs to their damage, and two, that defendants made false representations to plaintiffs, which plaintiffs relied on to their damage. If you find that plaintiffs sustained their burden of proof under the instructions I give you under either theory, or both theories, then plaintiffs are entitled to your verdict.

"Each of the plaintiffs has charged the defendants with a number of alleged misrepresentations. Plaintiffs are not required to prove all of these misrepresentations. The plaintiffs are required to prove but a single material false representation made by defendants to plaintiffs with the intent and purpose to deceive them, and which in fact did deceive them and was relied and acted upon by them to their injury."

The last instruction is followed by an instruction relative to a corporation controlled by "individuals to perpetrate a fraud, or accomplish some other wrongful or inequitable purpose, the corporate entity may be disregarded and the acts treated as if they were done by the individual or individuals themselves.

"Therefore, if you find that defendant Standard Engineering Corporation was owned, dominated and controlled by defendants Jack Leibert and Carlo Caletti, and was used by them to cause a fraud on the plaintiffs, you may disregard the corporate entity and hold defendants Jack Leibert and Carlo Caletti individually responsible in damages for such acts." Instructions follow regarding the "elements of fraud and deceit" and the definitions of actual and constructive fraud (Civ. Code, §§ 1572, 1573), with a definition of fraudulent deceit (Civ. Code, § 1709) and a specific definition of deceit (Civ. Code, § 1710). Thereafter the court instructed "Such intent may be inferred from the acts and conduct of the defendants, and from the presumption that the defendants must be deemed to have intended the natural and probable consequence of their act."

When the instructions are considered in conjunction with other "fraud" instructions and the evidence, the importance of the gross negligence or "conclusive" instruction is realized. The real groundwork of the alleged fraudulent transaction is the failure to obtain N.H.A. and F.H.A. approval. The jury may have concluded that defendants were negligent in not acquainting plaintiff with all of the data pertaining to the effort to obtain each approval. The evidence shows that N.H.A. approval had not been received at the time of making the alleged contract but was received before the "prefabricated" house was delivered to Rutherford. The F.H.A. approval was not received until about a year later.

The dual nature of the actions is apparent from the pleadings. In the first it is averred that defendants "falsely and fraudulently" made certain statements "with intent to deceive and defraud plaintiff, and to induce plaintiff . . .. to enter into an exclusive agency contract with defendants." In the third the allegation is that "Defendants agreed and warranted that the Federal Housing Administration had approved said prefabricated houses." Definitely the second cause of action is based upon warranty.

It is the duty of counsel for the respective parties to deliver to the trial judge all instructions covering the legal issues as appear in the pleadings. (Code Civ. Proc., § 607a.) Ignoring pleaded issues is generally regarded as prejudicial error. (24 Cal.Jur. § 96, p. 833.) "A warranty is a *part of the contract of sale*, while a fraudulent representation is an antecedent statement made as an inducement to enter into it. (*Calpetro Producers Syndicate* v. *Woods Co.* (1929), 206

Cal. 246 [274 P. 65].) . . . An essential element of actionable misrepresentation is *scienter* or knowledge of its falsity, or negligence in making it without reasonable ground for believing it to be true. (C.C. 1710). No conscious misstatement is required in the case of a warranty, which may be ground for an action though made in good faith.'' (Witkin's Summary of California Law, Sixth Ed. 1946, p. 248.) Plaintiff points out, not by quotation but by reference to page number in the reporter's transcript, instructions on the contract theory. None of the noted instructions deals specifically with warranty as set forth in the third cause of action. The jury was repeatedly instructed on the question of fraud, but the distinction between fraud and warranty was not touched upon.

Defendant requested an instruction, which merely was marked ''refused.'' It reads: ''There is a definite distinction between a fraudulent representation and a warranty. A fraudulent representation is an antecedent statement made as an inducement to the contract, but it is not a part or element of the contract.''

The cause of action based on warranty necessitated instructions appropriate to that cause of action. An action sounding in tort must be differentiated from one based on contract, particularly when the distinguishing feature is intent to deceive. (23 Am.Jur. § 136, p. 934.) The refusal of the court to give the last instruction, in view of the fact that no instruction was given defining warranty, is erroneous, and under the circumstances surrounding the substance of the pleadings, the evidence and all of the instructions, it must be regarded as prejudicially erroneous.

An evidentiary matter should be mentioned in connection with the warranty cause of action. The sale of the house was alleged to be dependent upon financing by a bank. Presumably the financing was dependent upon the approval of the United States housing authorities. That of *N*.H.A., which defendants assert without contradiction to be the ''mother'' of *F*.H.A., was obtained in May, 1946. The prefabricated house was delivered in June, 1946.

It has been suggested that, if the judgment must be reversed on the fraud cause of action or the warranty cause of action, possibly the pleadings or the evidence show a cause of action for a mere breach of contract without a warranty and without fraud. The complaint does not plead a cause of action designated as breach of contract other than the ''warranty'' cause. If damages are recoverable, the

theory adopted by the litigant and the court will be adhered to on appeal. (*Grupe* v. *Glick*, 26 Cal.2d 680 [150 P.2d 832].)

However, assuming that from the warranty and fraud causes of action as alleged in the complaint, there may be gleaned some allegation or allegations that the theory of this case was just breach of contract, or that there is evidence which would have justified a verdict upon the contract without resorting to the warranty or deceit theory, there are no sufficient instructions that state the necessary elements of such theory. Any allegations of mere breach of contract are so interwoven with the fraud or warranty theory that it must be determined only two main causes of action are pleaded in this case.

It is suggested that even if there was error in the giving of the instruction on intent to deceive, that such error could not have affected the cause of action on warranty or for some breach of contract. It is also suggested that on contract or warranty or fraud, the jury had to find the making of a representation or warranty, that it was false and that plaintiff relied upon it to his damage. The fraud action included those elements, plus the element of intent to deceive. It may be argued that the jury, assuming it found there was actionable fraud, must have found that all of the elements to sustain an action on contract or warranty existed, and found as well, intent to deceive. Its finding on intent to deceive was induced by the erroneous instruction, but in substance says plaintiff, the other implied findings stand unimpaired. At first blush this sounds like a convincing argument, but upon analysis it must be held to be erroneous. Such an argument disregards the realities. The issues in this case were whether certain false representations had been made. The plaintiff so testified. The defense was that defendants did not say that they had *F*.H.A. and *N*.H.A. and other approval, but that they were trying to get such approval and thought they could obtain it. Thus the real issue was whether the jury was to believe plaintiff or defendants. By the erroneous instruction the jury was told that gross negligence in the making of such statements was ''conclusive'' evidence of intent to deceive. It cannot be determined whether the jury found an actual intent to deceive or whether it found gross negligence and therefore conclusively presumed the intent to deceive. Insofar as the implied finding of intent to deceive is concerned, it cannot be sustained because of the erroneous instruction. Obviously such an erroneous finding permeates the

other implied findings. Having based its finding of intent to deceive upon an erroneous instruction, how can it be said that the jury passed on the credibility of the parties without reference to such erroneous finding? Having found that defendants had the intent to deceive, how could the jury believe the defendants on the issue as to whether the representations had in fact been made? No jury could objectively pass on the credibility of the defendants after finding that such defendants had the intent to deceive. Thus the error in giving the "conclusive presumption" instruction affected all of the implied findings of the jury.

Moreover, as already pointed out, the instructions were based upon the theory of fraud. The only instructions on the issue of damages were instructions on the measure of damages for fraud. Under section 3333 of the Civil Code in tort cases the injured party is enitled to the "amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." For wilful deceit the injured party is entitled to be compensated under section 1709, Civil Code, "for any damage which he thereby suffers." For breach of contract the injured party is entitled to such amount as will compensate him "for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result" (Civ. Code, § 3300), whereas under section 1789, subdivision 6, the damage for breach of warranty is specifically fixed. In brief, the measure of damages fixed for a tort and for a breach of contract is in many respects the same except where the code provides a special statutory rule for a specific tort or a breach of contract. In any instance damages must be ascertainable in nature and origin. There is a distinction between damages for a breach of warranty and damages for fraudulent deceit. The "loss directly and naturally resulting in the ordinary course of events" (Civ. Code, § 1789, subd. 6) has reference to a loss that is wholly, completely, immediately and intrinsically due to the breach of a warranty, whereas for fraudulent deceit "any damage which he thereby suffers" (Civ. Code, § 1709) refers to an indifference in time or place and to quality or quantity, if the liability is reasonably connected with the damage suffered. In view of the retrial the jury should be instructed as to the distinctions between the kinds of damage if the respective sides adhere to the present theories. The previous trial was conducted upon the theory of fraud.

The court ruled from the very outset of the trial that this was a fraud case. When defendant Leibert was asked how many shares he owned in the Standard Engineering Corporation, the court stated: ''I will overrule the objection. I would like to know and I think the jury would like to know. There are certain serious charges here and we would like to know the history of it.'' The court also remarked: ''The corporation as an entity must be preserved and treated as such in all cases except where fraud is alleged. Then you can go behind the corporate character of the institution, whatever it may be, and look through its corporate character and into the real ownership and ascertain whether fraud has been perpetrated. This is a fraud action. . . . What I am interested in and I think the jury is, was there fraud and if so, who perpetrated it.''

The judgment is reversed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied December 17, 1948, and respondent's petition for a hearing by the Supreme Court was denied January 13, 1949. Carter, J., and Traynor, J., voted for a hearing.