**F. T. CANON, Plaintiff,**

v.

**F. L. CHAPMAN dba Chapman Pipe & Supply; Don Harman dba Don Harman Pipe & Supply; Billy Gene Smith dba Star Drilling Company, Defendants.**

Civ. No. 7018.

United States District Court
W. D. Oklahoma.

March 21, 1958.

Looney, Watts, Looney & Nichols, Oklahoma City, Okl., for plaintiff.

John B. Ogden, Brown & Verity, Saunders & Sandlin, Oklahoma City, Okl., for defendants.

RIZLEY, District Judge.

The plaintiff, F. T. Canon, instituted this action seeking recision of a purchase contract on a used oil-well drilling rig and a return of $15,000 cash paid on the purchase price of the rig, cancellation of two promissory notes given for the purchase price of the rig and for damages. The plaintiff alleges joint action by all of the defendants amounting to fraud in the sale of the rig, false representations, breach of express warranty and breach of fiduciary relationship.

The defendant Smith on behalf of the Star Drilling Company counterclaimed seeking judgment on an $8,000 note given by plaintiff for part of the purchase price of the rig.

The defendant Chapman counterclaimed for sums expended for repair to the rig and for judgment on a $2,000 promissory note given by plaintiff as part of the purchase price and in which he, Chapman, claims to own an undivided one-half interest.

The defendant Harman counterclaimed on the same $2,000 note in which he claims to own an undivided one-half interest.

The defendant Smith on behalf of the Star Drilling Company filed a cross-complaint against the defendant Harman which was voluntarily withdrawn before trial.

The Court finds the following facts and conclusions of law according to its conception of the preponderance of the evidence:

## Findings of Fact

1. The plaintiff now is, and during all material times has been, a citizen and resident of the State of Michigan.

2. The defendants now are, and during all times material have been, citizens and residents of the State of Oklahoma.

3. The amount in controversy in the case exceeds the sum of $3,000 exclusive of interest and costs.

4. The plaintiff, F. T. Canon, lives in Detroit, Michigan. He has been engaged in the oil business since 1930 or 1931 and has operated "cable tool drilling rigs" in the states of Michigan, Ohio and West Virginia. He also worked as a truck driver and rough neck in oil fields in Texas where "rotary drilling rigs" were used.

5. The defendant F. L. Chapman is the owner of the Chapman Pipe and Supply Company at Oklahoma City, Oklahoma, and deals in all kinds of used oil field equipment, including used rotary drilling rigs.

6. The plaintiff first met Chapman in 1950 or 1951 in Chicago, Illinois, and in 1951 or 1952, he visited with the defendant Chapman in Oklahoma City, Oklahoma, for one day while enroute to Albuquerque, New Mexico, and had talked with him two or three times on the telephone prior to 1955.

7. In July, 1955, the plaintiff telephoned the defendant Chapman and requested Chapman to look over some rotary drilling rigs owned by the Tiger Drilling Company of Oklahoma City which had been advertised for sale in a national oil and gas publication. The plaintiff offered to pay the defendant Chapman for inspecting the rigs and advised Chapman that he wanted to buy a rotary drilling rig which would drill from 2,500 to 3,500 feet without breakdowns and that he wanted the rig by September 1, 1955. Chapman inspected the Tiger Drilling Company's rotary rigs and telephoned the plaintiff regarding them, but the plaintiff concluded that these were too high priced for him.

8. A short time thereafter, the defendant Chapman telephoned the plaintiff at Detroit, Michigan, and told the plaintiff that he, Chapman, had located

a drilling rig which might meet the plaintiff's requirements and requested the plaintiff to come to Oklahoma City to inspect the rig. Chapman said that a partnership was breaking up and that the partners, who owned the rig, needed the money. He was, in reality, referring to the Star Drilling Company which is a corporation rather than a partnership.

9. Prior to this last mentioned telephone call, the defendant Chapman in a conversation with the defendant Harman had learned that the Star Drilling Company, an Oklahoma Corporation of which the defendant Billy Gene Smith was the President, had listed a used Wilson rotary drilling rig for sale.

10. The defendant Don Harman is the owner and operator of the Don Harman Pipe and Supply Company in Oklahoma City and was engaged in buying and selling all kinds of used oil field equipment including used rotary drilling rigs. An inventory of the Star Drilling Company rig had been left with the defendant Harman by the defendant Billy Gene Smith who stated that he wanted to sell the rig for the net sum of $20,000 and the broker, Harman, could add another ten percent (10%) or $2,000 on the sale price for his commission in selling the rig.

11. At the request of the defendant Chapman, the plaintiff came to Oklahoma City. After his arrival in Oklahoma City, the defendant Chapman made known his opinion that the Star Drilling Company rig was in good shape and would drill a well within a reasonable time to a depth of 3,500 feet. Chapman had not inspected the rig and so informed the plaintiff of this fact.

12. On the day following his arrival in Oklahoma City, the plaintiff and the defendants Chapman and Harman drove in Harman's car to Carter County, Oklahoma, to inspect the Star Drilling Company rig. On the trip to Carter County, the rig was discussed in a general way. The defendant Chapman told the plaintiff that the rig had drilled several wells in recent months and was apparently in good shape. The defendant Chapman asked the plaintiff to refrain from discussing price with Smith upon their arrival in Carter County for the reason that he, Chapman, could get a better deal on the price if the plaintiff would allow him, Chapman, to negotiate with Smith. Because of this request by the defendant Chapman, plaintiff did not discuss price with Smith, but instead left negotiations on price up to the defendant Chapman.

13. When the plaintiff and the defendants Chapman and Harman arrived at the lease site in Carter County, the rig was stacked. The defendants Chapman and Harman introduced the plaintiff to Billy Gene Smith, president of the Star Drilling Company, and then walked away while the plaintiff and Smith inspected and discussed the rig. While plaintiff contends that the defendant Billy Gene Smith represented to plaintiff that "this particular rig was in first-class mechanical condition and was capable of drilling to 3500 feet with a minimum of repairs," the preponderance of the evidence is that the only representations made in this connection were to the effect that *"this rig had recently drilled numerous wells without necessity of major repair or loss of time."* The overwhelming evidence by outstanding representatives of the oil business who had engaged the services of the rig shortly before the sale, was to the effect that such representations were true.

14. The plaintiff was told by Billy Gene Smith that the chain guard should be fixed and that the water pump on one of the motors leaked and pointed out other necessary repairs. Smith also stated that he had a few joints of worn drill pipe that should be replaced, but that he had about 2,500 feet of good drill pipe. The plaintiff wanted an additional 1,000 feet of drill pipe and wanted the rig cleaned up and painted and also wanted the necessary replacement parts secured and installed.

15. The defendants Chapman and Harman agreed to obtain the additional 1,000 feet of drill pipe and a rotary hose

at the plaintiff's expense. Billy Gene Smith agreed to buy the repair parts and employ the necessary labor, obtain paint and other materials needed, and supervise the cleaning and painting of the rig prior to shipping it to Ohio. The defendant Chapman authorized Billy Gene Smith to charge the paint, materials and labor to him and he, Chapman, in turn billed the plaintiff for these items, none of which has been paid.

16. After returning to Oklahoma City, the defendant Harman telephoned Billy Gene Smith and falsely told Smith that the plaintiff, Canon, would purchase the rig at a price not to exceed $18,000 provided that Smith would accept $10,000 cash and a promissory note for the balance of $8,000, secured by a chattel mortgage on the rig. Smith agreed to sell the rig for $18,000 and agreed to $10,000 in cash with a note and chattel mortgage to cover the balance.

17. The defendant Chapman discussed the matter with the defendant Harman in private and on the following morning the defendant Chapman met the plaintiff at the Skirvin Hotel in Oklahoma City. He told the plaintiff that the rig could be purchased for $25,000. The defendant Chapman falsely told the plaintiff that Smith required $15,000 cash, but would accept a promissory note due in ninety days in the sum of $10,000 for the balance. The plaintiff, relying on the statements of the defendant Chapman as to the purchase price and the manner in which it was to be handled, agreed to pay $25,000 for the rig and gave the defendant Chapman his personal check for $2,000 at that time and agreed to send to Chapman a cashier's check for $13,000 to complete the cash payment of $15,000 which plaintiff thought was required by Smith.

18. The plaintiff at this time inquired of the defendant Chapman as to the compensation which Chapman would require for his services. Chapman informed the plaintiff that he would receive a commission from the defendant Billy Gene Smith and that there would be no brokerage fee necessary from the plaintiff. Plaintiff then returned to his home in Detroit, Michigan, and on August 25, 1955, the plaintiff mailed to the defendant Chapman a cashier's check for $13,000. On August 25, 1955, the plaintiff executed and mailed to the defendant Chapman two promissory notes due in ninety days, one for $8,000 and one for $2,000 and at the direction of the defendant Chapman both were made payable to the Okemah National Bank of Okemah, Oklahoma. The $8,000 note was secured by a chattel mortgage on the rig and was held by the Okemah National Bank for the account of Star Drilling Company. The $2,000 note was unsecured and was held by the Okemah National Bank for the account of Chapman and Harman, each of whom claim a one-half interest in said note. Both notes are due and unpaid.

19. The defendants Chapman and Harman paid $10,000 out of the $15,000 cash payment to Billy Gene Smith to apply on the $18,000 sale price and Billy Gene Smith agreed to accept the plaintiff's mortgage note for $8,000 in payment of the balance of the sale price.

20. The defendant Chapman expended $900 for repairs and labor to the rig and billed the plaintiff therefor. He furnished 1,000 feet of drill pipe valued at $2,000.

21. The rig was then transported to Ohio where it was put in operation in an attempt to drill a well. Numerous breakdowns occurred during the first weeks of operation which included failure of the sprocket chains, the mud pump motor and clutch on the draw works and the drilling line. The draw works motor had a broken head and was replaced first with a Ford motor and later with two compounded Buick motors. A considerable portion of the drilling trouble was caused by the loss of circulation resulting from a failure to set enough surface pipe in the well. The plaintiff continued to use the rig until March, 1956, when he decided that the rig could not be fixed. At the time plaintiff abandoned the rig in March, 1956, he had drilled to 3,000 feet. The hole was abandoned at this depth

because 600 feet of drill pipe had twisted off in the hole and a fishing job was unsuccessful.

22. The plaintiff did not pay the two promissory notes when they became due on November 26, 1955, and asked the Okemah National Bank for a sixty-day extension of time in which to pay. The plaintiff made no complaint to the defendants Chapman or Harman, nor to the Okemah National Bank about the condition of the drilling rig prior to filing this lawsuit.

## Conclusions of Law

### I

The Court has jurisdiction over the parties and the subject matter.

### II

The purchase contract for the drilling rig was between plaintiff and defendant Billy Gene Smith as president of Star Drilling Company.

### III

The defendant Harman was broker and agent for the defendant Billy Gene Smith as president of Star Drilling Company.

### IV

The defendant Chapman was broker and agent for the plaintiff in matters relating to the negotiations for the purchase of the rig and in making the arrangements for the financing thereof.

### V

Each of the defendants occupies a different legal capacity in relation to the plaintiff, and each will be discussed separately here regarding their liability or non-liability under the facts before stated.

A. The defendant Billy Gene Smith made no representations or warranties to the plaintiff which in law would give the plaintiff the right to rescind the purchase contract or to recover damages.

Although plaintiff alleged in his complaint facts amounting to deceit or false representations, he also alleges breach of warranty in the sale of the drilling rig. The legal distinction is that a "false representation" is an antecedent statement made as an inducement to enter into a contract while a "warranty" is a part of the contract of sale. An essential element of actionable misrepresentation is *scienter* or knowledge of its falsity or negligence in making it without reasonable ground for believing it to be true; whereas no conscious misstatement is required in the case of a warranty which may be ground for an action though made in good faith. Rutherford v. Standard Engineering Corp., 88 Cal.App.2d 554, 199 P.2d 354. Both may develop from the same representation. Gagne v. Bertran, 43 Cal.2d 481, 275 P.2d 15. Certainly the plaintiff has not proved the defendant Smith guilty of any statements amounting to false representation. We turn, therefore, to ascertain whether there were statements made by Smith which amounted to a warranty.

A warranty is a statement or representation made by the seller of goods, contemporaneously with, and as a part of the contract of sale, although collateral to the express object of it, having reference to the character, or quality, or title of the goods, and by which he promises or undertakes to insure that certain facts are or shall be as he represents them. Commonwealth Cotton Oil Co. v. Lester, 156 Okl. 93, 9 P.2d 738; United Iron Works Co. v. Henryetta Coal Mining Co., 62 Okl. 99, 162 P. 209.

In the case of Wat Henry Pontiac Co. v. Bradley, 202 Okl. 82, 210 P.2d 348, 349, the court stated:

"Warranty is a matter of intention. A decisive test is whether the vendor assumes to assert a fact of which the buyer is ignorant, or merely states an opinion, or his judgment, upon * * * which the buyer may also be expected to have an opinion and to exercise his judgment. In the former case there is a warranty; in the latter case there is not."

# 110

■■ Matters of opinion, judgment, estimate or "dealer's talk" are permissible and whether a given statement made by the seller to the buyer, at the time of the sale, constitutes a warranty or not appears to be a question of the intention of the parties and the circumstances under which the statements were made. Eden v. Vloedman, 202 Okl. 462, 214 P.2d 930; Mercantile Trust Co. v. Roland, 143 Okl. 190, 288 P. 300; Frey v. Failes, 37 Okl. 297, 132 P. 342.

■ Plaintiff had been in the drilling business for many years, and although he had not owned a rig of this particular type, he had worked with such rigs. He knew he was paying ⅕th of the price of a new rig. He knew that this rig was priced at a figure much less than other used rigs which he had considered. The evidence supports the fact that the plaintiff not only formed his own opinion of the condition of the rig and its capacity after the inspection and investigation, but that he relied on that opinion in agreeing to buy the rig and not on any of the alleged statements of the defendant, Billy Gene Smith.

■ B. The defendant Harman made no statements in respect to the rig which could have been termed either a false representation or a warranty. Even though he had made such misrepresentation or warranty which he did not, he was the agent and broker for the defendant Billy Gene Smith and as such agent he had no authority to do so. A broker has no implied authority to warrant property the sale of which he is engaged merely to negotiate. W. & S. Job & Company v. Heidritter Lumber Company, 2 Cir., 255 F. 311; Hitchcock v. Griffin & Skelley Co., 99 Mich. 447, 58 N.W. 373. There was no proof that the defendant Harman as broker for the seller had the authority to give a warranty and the burden was on plaintiff to establish such authority. Johnson v. City Co. of New York, 10 Cir., 78 F.2d 782; Moore v. Switzer, 78 Colo. 63, 239 P. 874.

■ C. The defendant Chapman made no statements which would result in his liability for false representation or warranty concerning the quality of the rig. The plaintiff's proof wholly fails to sustain his allegations that plaintiff was induced to enter into the contract by reason of the statements made by the defendant Chapman concerning the quality of the rig. The defendant Chapman could not be liable for breach of warranty because he was broker for the plaintiff in negotiating the purchase of the rig.

■ Warranty is an action in contract and is incident to a sale. It arises when a seller or his agent makes a statement or representation to the purchaser as a part of the inducement for the sale. Plastic Products Corp. v. Filtrol Corp., D.C., 137 F.Supp. 401.

■ If the defendant Chapman had made false statements to his principal which he knew to be false concerning the quality of the rig or if he had knowledge of defect in the rig which he failed to disclose, he would have breached his fiduciary relationship with his principal and be liable in an action based on tort for the breach of this duty. 8 Am.Jur. 1038 Brokers Sec. 89. But, the testimony reveals no statements made by the defendant Chapman which he knew to be false relating to the quality of the rig. Neither does the evidence show that Chapman had knowledge of any defects in the rig which his duty required him to disclose. The facts are that the defendant Chapman took the plaintiff to Carter County to inspect the rig and waited some distance away while plaintiff talked to Smith about the rig. The evidence is that the defendant Chapman disclosed all he knew about the rig and no more except for the price negotiations to which we now turn.

## VI

■ The defendant Chapman breached his fiduciary duty as broker to the plaintiff in regard to negotiating the price of the rig. In this fiduciary capac-

ity, the defendant Chapman was required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment. 8 Am.Jur. 1035–1036, Brokers Sec. 86. A broker cannot without violating his general duty of good faith act for persons having interests adverse to those of his employer unless he acts with the consent of his employer given with full knowledge of the facts. 8 Am.Jur. 1036, Brokers Sec. 87. The defendant Chapman subverted the interests of his principal to his own interests. He cautioned the plaintiff not to discuss price with the seller Smith advising the plaintiff that he, Chapman, could obtain a better deal on the purchase of the rig. He represented to plaintiff that the seller demanded $15,000 down payment when in reality seller had agreed to $10,000. Chapman pocketed the $5,000 difference. Chapman testified that he purchased the rig from Smith and resold it to plaintiff. The facts reveal the contrary when the proof showed that Chapman deliberately led both buyer and seller to believe that they were dealing with each other through their respective brokers, Chapman and Harman.

Brokers representing the opposing sides to a negotiation who secretly agree without the knowledge or sanction of their principals to pool their respective commissions and divide them according to a prearranged plan are not entitled to be compensated by their employers and the agreement between themselves is void and unenforceable as being contrary to public policy. Pickering Lumber Co. v. Sherritt, 105 Okl. 52, 233 P. 179; Peaden v. Marler, 78 Okl. 200, 189 P. 741; Levy v. Spencer, 18 Colo. 532, 33 P. 415, 36 Am.St.Rep. 303.

The faithful discharge of his duties as broker is a condition precedent to any recovery by the broker for the services he has rendered his principal. Wilcox v. Reynolds, 169 Okl. 153, 36 P. 2d 488. Thus he is not entitled to compensation if he acts adverse to his principal's interest either for the purpose of aiding another or with the design of se-

curing a secret profit for himself. Wilcox v. Reynolds, supra; 8 Am.Jur. 1067, Brokers Sec. 142.

It therefore logically follows that where a broker engaged to buy property, enters into a collusive agreement with the broker for the seller for the purpose of making a secret profit, the principal is entitled to recover back both the secret profit and the commission which such broker received. Wechsler v. Bowman, 285 N.Y. 284, 34 N.E.2d 322, 134 A.L.R. 1337, 1348; Id., 286 N.Y. 582, 35 N.E.2d 930.

## VII

The plaintiff should recover the secret profit which his broker, Chapman, made on the transaction. This secret profit is the amount actually paid by plaintiff to Chapman over and above the actual purchase price of the rig less the amounts expended by Chapman for repair and additions to the rig. The defendant Chapman received $15,000 in cash from plaintiff and paid Smith only $10,000. Thus the defendant Chapman received $5,000 in cash plus the $2,000 note held for the joint benefit of Chapman and Harman. Since brokers who enter into collusive agreements to the detriment of their principals cannot recover on a note given as a commission, the note should be canceled. The defendant Chapman expended $900 on repairs and furnished $2,000 worth of drill pipe for which he has not been paid by plaintiff. These sums should be set off against the secret profit which Chapman received. The plaintiff is therefore entitled to have judgment canceling the $2,000 note and a money judgment of $2,100 against the defendant Chapman.

## VIII

The defendant Star Drilling Company should have judgment on the $8,000 against the plaintiff plus interest and a ten percent attorney fee.

## IX

The costs of this action will be borne equally by plaintiff and the defendant Chapman.

## X

Plaintiff will prepare a form of judgment consistent with the views herein expressed. Such judgment will be filed as the Final Judgment in this action upon approval by the Court.