In re Jack N. YOUNESI, aka Jack
Nejat Younesi, Debtor.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., a corporation, Plaintiff,
v.

Jack N. YOUNESI, Defendant.

Bankruptcy No. LA 82–03824–JB.
Adv. No. LA 82–4743–JB.

United States Bankruptcy Court,
C.D. California.

June 15, 1983.

Franklin K. Lane, Los Angeles, Cal., for defendant.

Overton, Lyman & Prince, Los Angeles, Cal., for plaintiff.

### SUPPLEMENTAL MEMORANDUM OF DECISION

JOHN E. BERGENER, Bankruptcy Judge.

Motion to Amend Findings, Make Additional Findings and Amend Order having been filed in the above-entitled action by plaintiff Merrill Lynch, Pierce, Fenner & Smith Inc., this Court hereby supplements its Memorandum of Decision to present more fully for the understanding of the parties the legal and factual bases of that decision.

Plaintiff objected to the dischargeability of a debt owed to it by defendant Jack N. Younesi incurred as a result of certain trades in securities he made on May 3, 4 and 5, 1976. The amount of this debt was stipulated to be $71,660.41, exclusive of interest. Plaintiff alleged these damages to be the result of false pretenses or actual fraud by defendant, this contention grounded largely but not exclusively on defendant's having given plaintiff three NSF checks. There was evidence, accepted by this Court, that defendant was aware at the time he wrote the checks they were not backed by sufficient funds and that he had little hope of making them good subsequently save through fortunate trades on the stock market. There was testimony also that plaintiff allowed defendant Younesi to trade in securities on credit without investigating his ability to pay or requiring from him the typical deposit, that Mr. Younesi parted with the three checks only after repeated pleading and cajoling from his broker, Mr. Ridout, and that plaintiff made no effort to determine whether the checks were backed by sufficient funds apart from depositing them to its bank in the normal course of business.

As will be explained in detail below, the conclusion of this Court was that defendant had demonstrated the requisite *scienter* for a finding of fraud or false pretenses under 523(a)(2)(A) of the Bankruptcy Code, but that plaintiff had not reasonably relied on defendant's intentional misrepresentations beyond the point at which it was presented with the opportunity to substantiate the first of defendant's checks and declined to do so. Therefore, the subject debt was held in part dischargeable and in part nondischargeable.

The bankruptcy courts frequently see litigation of this type, brokerage houses seeking determinations that debts owed them by former clients are nondischargeable in bankruptcy, many of these cases involving NSF checks. The reason is obvious. Brokerage houses offer what is essentially a form of legalized gambling on credit. This credit is sometimes extended quite casually. Although federal regulations limit the time between purchase of securities and payment for the purchases, the time can be extended through the simple device of paying by personal check and thereby adding the several days needed for the check to be processed. The potential for disaster is undeniable.

Because many arrangements between broker and client are not premised upon the submission of a written financial statement by the client, or in the event that such a statement is required but contains no material misrepresentations, a broker's claim of nondischargeability must be based on § 523(a)(2)(A) of the Bankruptcy Code. To prevail on such a claim, the broker has the burden of proving by clear and convincing evidence:

> (1) a false representation or representations by debtor; (2) debtor's knowledge of the falsity of the representation; (3) debtor's intention and purpose to deceive the creditor; (4) creditor's reliance on such representations; (5) creditor's losses, proximately caused by debtor's false representations.

*In re Paulk,* 25 B.R. 919 (Bkrtcy.M.D.Ga. 1982), *see also, In re Lo Bosco,* 14 B.R. 739 (Bkrtcy.E.D.N.Y.1981), COLLIER ON BANKRUPTCY ¶ 523.08[4] (15th Ed.1982).

In the case of a client who simply encounters losses on the market and refuses to settle his account, not attempting to stall the broker for additional time by tendering an NSF check, the requirements of the section are very difficult indeed for the broker to prove. One Court has ruled that a debtor who continues to play the market after his situation has deteriorated to the point he knows it to be hopeless is guilty of false representations or· actual fraud, potentially rendering the debt nondischargeable. *Matter of Greenwald,* 2 B.R. 35 (Bkrtcy.S.D.Fla. 1979). This is apparently by analogy to the "credit card cases" finding extraordinary consumer credit purchases on the eve of bankruptcy indicative of a conscious intent not to pay for the goods received. *See, e.g., Matter of Hadley,* 25 B.R. 713 (Bkrtcy.M.D. Fla.1982), *In re Manuel,* 24 B.R. 744 (Bkrtcy.S.D.Ohio 1982).

Problems exist, however, in extending this theory to cover debts to stockbrokers. First, it is difficult if not impossible to determine the point at which the debtor realized his position to be hopeless, assuming such a realization ever occurred. The intention of an individual playing the market while insolvent is hardly to lose a large sum of money and then declare bankruptcy, or, as in the credit card cases, to acquire something on credit and then hide behind the exemptions of the Bankruptcy Code to escape payment. It is the intention of any losing gambler, to keep playing until his luck changes. No matter how far down he may be, there is always the hope of reversing the trend. This attitude may be quite unrealistic, but so long as it is genuinely held there does not exist the element of *scienter* characteristic of fraud or false pretenses. *Rutherford v. Standard Eng. Corp.,* 88 Cal.App.2d 554, 199 P.2d 354 (1948), COLLIER ON BANKRUPTCY ¶ 523.08[4] (15th Ed.1982). The bankruptcy courts are filled with debtors who have badly overextended their credit based on unrealistic appraisals of their future ability to pay, yet the debts so incurred are normally dis-

chargeable in bankruptcy. There is no reason a debt should be treated differently simply because it is owed to a stockbroker.

In the instant case plaintiff argues that, because defendant had unpaid bills outstanding from two other brokerage houses, he had begun trading at its firm already possessed of the intention not to pay for his stock purchases. This contention is illogical. Again, no one, whether he be trader, speculator, or investor, plays the stock market with the intention of losing money and to take home a profit one must first liquidate one's holdings and settle the account with the broker.

More plausibly, plaintiff points to the three NSF checks written by Mr. Younesi to keep his account open beyond the time it would have been closed subject to federal regulations if payment was not made, suggesting that these demonstrate fraudulent intent. It appears from the evidence that defendant was aware the checks were not backed by sufficient funds when he wrote them. The issue of whether fraudulent intent may be shown by this and no more must be examined in light of the recent U.S. Supreme Court decision stating:

> Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the fact amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable on demand" § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2).

*Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 3092, 73 L.Ed.2d 767 (1982).

■ Consequently, a personal check must be regarded as merely a promise to pay a certain sum of money, not a representation as to the state of the drawer's bank account. *See also, In re Paulk, supra* at 917 (applying the holding of *Williams* to § 523(a)(2) of the Bankruptcy Code). To find that a nondischargeable debt results from the receiving of goods or services in exchange for an NSF check, it must be shown not only that the drawer knew the check to be backed by insufficient funds but also that he knew, or intended, that he would not honor it himself. *In re Lo Bosco, supra* at 742, *In re Holt,* 24 B.R. 696 (Bkrtcy.E.D.Va.1982), *Matter of Anson,* 9 B.R. 741 (Bkrtcy.W.D.Mo.1981), *In re Eason,* 1 B.R. 604 (Bkrtcy.E.D.Va.1979), *Blue Bonnet Creamery, Inc. v. Gulf Milk Ass'n,* 172 So.2d 133 (La.App.1965), *In re Marin,* CCh Dec. ¶ 66,383 (M.D.Fla.1977), *In re Olsen,* CCH Dec. ¶ 66,781 (W.D.Wis.1978).

Recently, however, the Appellate Panel for the Ninth Circuit ruled as follows on facts nearly identical to those of the instant case:

> [Defendant] knew (or should have known) there were insufficient funds to cover two or more of the checks. *Tendering the checks was an implicit representation the checks were good.* The representation was false... Defendant knew that plaintiff would cut off his trading if checks were not issued: thus, they were issued for the purpose of inducing reliance. The logic of these facts leads to only one ultimate finding of fact: defendant intended to deceive plaintiff when at least two of the checks were issued.

*In re Kurdoghlian,* 30 B.R. 500 (Bkrtcy.App. 9th Cir.1983) (ordered published) [Emphasis added].

Although it is difficult to reconcile the language of the Appellate Panel's opinion with this Court's understanding of the pre-

vailing law on this question, particularly in consideration of the above-quoted Supreme Court decision, the facts of the two cases are indistinguishable and I am bound to follow the Appellate Panel's direction. For this reason, I conclude that defendant acted with an intent to deceive in tendering the three NSF checks, whether or not he intended to honor them subsequently.

One issue not addressed in *Kurdoghlian* and which must be here is that of reasonable reliance: did plaintiff act reasonably in allowing defendant to continue trading on the strength of three unverified personal checks?

The requirement of reasonable reliance is not specifically included in the terms of § 523(a)(2)(A) of the Bankruptcy Code, as it is in § 523(a)(2)(B). Nevertheless, the courts seem inclined to read such a standard into the section. As one commentator has stated:

> Since the debtor's "fresh start" is a primary aim of the bankruptcy law, and nondischargeability interferes with the "fresh start," a debt should be excepted from discharge only when a creditor's loss is directly caused by the debtor's conduct. Reading a reasonable-reliance requirement into the false-pretenses section would in effect deemphasize the retributive aspect of the Bankruptcy Code and promote more equitable treatment of both debtors and creditors. Thus, while it would have been helpful for Congress to have explicitly put a reasonable-reliance requirement into the false-pretenses section, the failure to do so should not bar courts from continuing to read in that requirement.

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Bkrtcy.L.J. 253, 258 (1979). *Accord,* COLLIER ON BANKRUPTCY ¶ 523.08[4] (15th Ed.1982), *Matter of Anderson,* 10 B.R. 296 (Bkrtcy.W.D.Wis.1981), *Matter of Wise,* 6 B.R. 867 (Bkrtcy.M.D.Fla.1980).

■ In the case at bar, plaintiff extended credit to defendant with little or no investigation of his creditworthiness. No deposit was required for him to open an account.

When payment was demanded for the initial purchases made, defendant proved evasive and reluctant to comply. When finally he did ostensibly tender payment for those purchases, it was by personal check and on the last day he could do so without seeing his account liquidated.

In view of these facts, I must conclude that if plaintiff was reasonable in continuing to allow defendant to trade in securities on the strength of his personal checks, it was only for so long as it would have taken plaintiff to determine whether the first of these checks was backed by adequate funds. This it could easily have done on the date that first check was received by a single telephone call or, at most, visit to defendant's bank. This it did not do. Instead it accepted without question two more of his checks, both issued with obvious reluctance, and waited until they began coming back NSF from its bank before closing Mr. Younesi's account.

It is impossible for me to accept that this course of conduct on the part of plaintiff was founded upon reasonable reliance. If plaintiff relied on the checks at all, his reliance ceased to be reasonable after it was presented with a clear opportunity to investigate whether the checks were good but declined to do so. Therefore, I have concluded that all damages resulting from defendant's trades made on May 3, 1976, giving plaintiff one day to determine the worth of the first check received, constitute a debt nondischargeable in bankruptcy. The amount of any such damages are subject to proof by plaintiff, as they are not determined from any evidence before this Court. All damages resulting from trades made by defendant after May 3, 1976, I have concluded, constitute a debt dischargeable in bankruptcy.

Plaintiff's Motion to Amend Findings & etc. is in substance a motion for reconsideration, unsupported by any contention of "new or different facts or circumstances" that merit reconsideration. It is therefore violative of Local Rule 904(k) and should be and hereby is denied.